Ꮢicḥmonḋ.

SCOTT V. ALBEMARLE HORSE SHOW ASSOCIATION.

November 18, 1920.

1. SPECIFIC PERFORMANCE—*Matter of Right—Discretion of Court.*
—The granting of the equitable remedy of specific performance
is not a matter of right but of discretion, not an arbitrary or
capricious, but a sound judicial discretion controlled by es-
tablished principles of equity, and exercised upon a consider-
ation of all the circumstances of each particular case.

2. SPECIFIC PERFORMANCE—*Proof of Contract—Requisites of Con-
tract.*—In order to justify a court of equity in compelling the
specific performance of a contract, the contract must be dis-
tinctly proved and its terms clearly ascertained. It must be
reasonable, certain, legal, mutual, based upon valuable con-
sideration, and the party seeking performance must not have
been backward in enforcing his rights, but ready, desirous,
prompt, and eager.

3. CONTRACTS—*Construed as a Whole.*—A contract is to be construed
as a whole, and effect given to every provision thereof if pos-
sible. No word or paragraph can be omitted in construing a
contract if it can be retained and a sensible construction given
to the contract as a whole.

4. CONTRACTS—*Construction—Conflict Between the Obligatory Part
of a Contract and Recitals.*—If there is any inconsistency be-
tween the obligatory part of the contract and the recitals there-
in, effect will be given to the obligatory part rather than to the
recitals, as this is regarded as the more vital and important of
the two; but the recitals are often helpful in the construction
of contracts and throw light on the meaning and intent of
the parties.

5. SPECIFIC PERFORMANCE—*Certainty of Contract—Question as to
whether a Contract was an Option or an Agreement to Sell—
Conflict Between Recitals and Obligatory Part of a Contract—
Case at Bar.*—In the instant case, a suit for specific perform-
ance, defendant insisted that the contract did not bind him to
purchase the land in question, but was an option contract. In
the preamble to the contract it was stated that an option was

given defendant, and also in the body of the contract the following words were used, "in consideration of the option to purchase," but the obligatory part of the contract bound defendant to take the property upon the terms mentioned. It was manifest, however, from the terms of the contract as a whole that it was the intention of the parties to give defendant an option.

*Held:* That under the circumstances, it might be well doubted whether the contract possessed that certainty and precision which a court of equity demands before it will decree specific performance.

6. Covenants — *Covenants Against Incumbrances — Building Restrictions.*—A covenant for a deed with general warranty and covenants of title is not fulfilled by a deed containing onerous building restrictions.

7. Covenants—*Covenants Against Incumbrances—Open and Obvious Easements.*—Easements which are open, obvious, and physical incumbrances upon the property are not within covenants against incumbrances, where the grantee's knowledge of their existence is shown either by deeds under which he claimed, or is, for some reason, presumed, so that resort to parol evidence is unnecessary.

8. Covenants — *Covenants Against Incumbrances — Building Restrictions—Parol Evidence to Show Knowledge.*—Where a vendor in a written contract agrees to convey land to the vendee by deed with general warranty and covenants of title, it may not be shown by parol evidence that, at the time of the purchase, the vendee had knowledge of the existence of building restrictions imposed on the property in the deed to his vendor, and hence that the building restrictions were not within the covenant against incumbrances stipulated for in the written contract of sale.

9. Vendor and Purchaser—*Parol Evidence—General Rule.*—The subject matter and terms of a contract of purchase are best gathered from the written contract of the parties, the sole repository of their agreement, which cannot be varied, altered, or contradicted by parol evidence of any prior or contemporaneous oral waiver or agreement.

10. Covenants—*Knowledge of Incumbrances.*—When a covenant is made against all encumbrances, without exception, knowledge of the existence of the encumbrance cannot take that encumbrance out of the general terms of the covenant, unless such was the intent of the parties. But knowledge alone does not prove such intent, for a contrary intent is consistent with it.

11. Covenants — *Covenants Against Incumbrances — Building Re-*

*strictions.*—Where a contract for the sale of land calls for a deed with general warranty and covenants of title, knowledge by the vendee of the existence of onerous building restrictions in the deed under which the vendor holds will not bar the vendee from setting up such restrictions as a defense in a suit for specific performance by the vendor.

Appeal from a decree of the Circuit Court of Albemarle county. Decree for plaintiff. Defendant appeals.

*Reversed.*

For several years prior to 1916, the Albemarle Horse Show Association had owned a tract of a few acres of land at Fry's Spring, near the city of Charlottesville, upon which it had held annual exhibits. In the early part of 1916 the association determined to enlarge its activities by adding horse racing to its other attractions, but the ground owned by it was not large enough for that purpose, and hence it determined to buy other and larger grounds. The appellant, Scott, was a member of the board of directors of the association. He took a very active interest in the affairs of the association, but, as he lived in the country, he was not as regular in his attendance on the meetings of the board as some of the other members. About this time the association issued its bonds for $10,000, secured by a mortgage on its Fry's Spring property, and Scott became the purchaser of $4,000 thereof. Scott was present at the meeting of the board which determined to buy the new grounds, and participated in its deliberations. The board determined to buy twenty acres of the land of the Redland Land Company at $4,000, and Scott loaned the association $5,000, to be used in part for the purchase price of the land, and to be secured to him by a deed of trust on the land purchased. The land was purchased and the association promptly went to work to construct the race tracks, judges' stand, stables, etc., and expended upwards of

$20,000 thereon. A successful exhibit was held on the new grounds on August 6 and 7, 1916, but shortly thereafter a severe rainstorm tore out a concrete culvert and did other damage to the race track, which it was estimated would require $1,800 to repair. The association was then indebted to a considerable amount and without means to repair the damage which had been done to the race track. Under these conditions, the board determined to sell this property, and appointed a committee to make the sale. The committee opened negotiations with the appellant, Scott, which resulted in the following contract:

"Whereas, the Albemarle Horse Show Association, a corporation, chartered under the laws of the State of Virginia, is desirous of having certain improvements upon the property hereinafter described, and E. W. Scott, Jr., is willing to guarantee the payment of said improvements, so that the same shall not exceed eighteen hundred dollars ($1,800), provided that an option is given him to purchase the said property, as hereinafter set out, at the price of thirteen thousand five hundred ($13,500), plus the amount to be paid for the improvements, not to exceed eighteen hundred dollars.

"Now, therefore, this contract, made this 19th day of September, 1916, between the Albemarle Horse Show Association, party of the first part, and E. W. Scott, Jr., party of the second part,

"Witnesseth: That for and in consideration of the option to purchase the property hereinafter mentioned, the said E. W. Scott, Jr., guarantees to pay for any and all improvements put upon the tract of said Albemarle Horse Show Association, so that the same shall not exceed eighteen hundred dollars ($1,800). And the said party of the first part hereby agrees and binds itself to sell to the said E. W. Scott its property on Meadow creek, Albemarle county, Virginia, consisting of twenty (20) acres of land

deeded to the said Albemarle Horse Show Association by the Redland Land Corporation on the 3rd day of May, 1916, by deed recorded in the clerk's office of the Circuit Court of Albemarle county in deed book 162, page 457, at the price of thirteen thousand, five hundred dollars ($13,-500) cash, plus any amount paid for said improvements not in excess of eighteen hundred dollars ($1,800), and said Scott agrees to take said property at said price in accordance with the terms of this contract.

"Out of the said thirteen thousand, five hundred dollars ($13,500), the purchase price of said land, the said Scott is to pay the floating debts of said association, amounting to eight thousand, five hundred dollars ($8,500), and apply the balance to the deed of trust for five thousand dollars ($5,000), which he now holds upon the land of the said Albemarle Horse Show Association herein referred to, and also to pay the amounts of the improvements heretofore mentioned, not in excess of eighteen hundred dollars ($1,800); but it is expressly understood and agreed that whilst the said Albemarle Horse Show Association agrees to sell and convey to the said Scott the aforesaid tract of land, it is further understood that if the said Scott is not called upon to pay the amount required for the improvements to the said tract of the said Association, not in excess of eighteen hundred dollars ($1,800), within sixty days from this date, then this contract is to be null and void, and the company is not to convey the said land to the said Scott. But in case the said Scott is required at any time within said sixty days to pay the amount so stated for said improvements not in excess of eighteen hundred dollars ($1,800), then the said Albemarle Horse Show Association hereby covenants and agrees to convey the said land to the said Scott by deed with general warranty and covenants of title; but if at any time within and up to sixty (60) days from the date of this agreement the said

66

Horse Show Association shall produce to the said Scott a receipt in full for the payment for said improvements heretofore mentioned, then this contract is to be null and void.

"The Albemarle Horse Show Association has by a resolution of its board of directors authorized Joel M. Cochran, J. E. Shepherd and John F. Payne as the committee to sell the said real estate on Meadow creek heretofore mentioned, and this contract is signed by the Albemarle Horse Show Association by said committee in pursuance of said resolutions, which were passed at the last directors' meeting held Monday, 11th day of September, 1916.

"It is further understood and agreed that this guarantee of the said E. W. Scott, Jr., is to be for sixty (60) days only, and unless the bills for said improvements are presented to him within sixty (60) days from the date of this agreement, then his guarantee is to cease.

"Witness the following signatures and seals."

The directors still hoped that they would be able to sell enough of the stock of the association to its friends to enable them to avoid a sale of its real estate. Hence the provision of the contract with reference to the payment of bills for repairs within sixty days. But this hope was not realized.

The Redland Land Company, from which the association had purchased the twenty acres, owned a tract of two hundred acres some five or six miles from Charlottesville, which it proposed to develop as a residential section, and used a printed form of deed which it proposed to use in all of its conveyances. This form contained the following restrictions:

"(1) That any building which may be erected on said land shall be so located that no portion thereof except porches shall be within fifty (50) feet of the road or street upon which it faces."

"(2) That said lot shall not be leased or sold to any person not of Caucasian race.

"(3) That no shop, store, factory, saloon or business house of any kind, no hospital, asylum or institution of like or kindred nature, and no charitable institution shall be erected or maintained on the premises hereby conveyed, but the said premises shall be occupied and used for residence purposes only, and not otherwise.

"(4) That no residence or dwelling house shall be erected or kept on said land, costing less than twenty-five hundred dollars ($2,500); that if any building or other structure be erected on said land, or any alterations made in a building or other structure erected thereon, such building or other structure shall be erected or such alterations made according to plans (including exterior color scheme, grading plan, and the location of such building or other structure), which shall have been approved by said first party.

"(5) No nuisance shall be maintained on said property."

In the original negotiations for the purchase of the twenty acres by the Horse Show Association from the Redland Company, the president of the Redland Land Company wrote to the president of the association that they would convey the latter company the twenty acres of land subject to the following restrictions:

"(1) That you will purchase a minimum of eighteen (18) acres, or a maximum of thirty (30) acres, at $200 per acre, cash; the plot to be bounded on the southeast by lots Nos. 41 and 40, thence along Rugby road northeast to Rhodes road, the northern boundary to be determined by your requirements—a description has been taken from map of Meadowbrook Hills, dated February, 1915.

"(2) The right to play golf across the land is reserved, and no unnecessary obstructions shall be placed so as to interfere with said right.

"(3) No structure of any kind shall be erected without first submitting plan of same, and having the approval of this company.

"(4) No nuisance shall be maintained on said property."

With this letter there was also enclosed one of the printed forms of deed aforesaid. The deed consummating the purchase contained substantially all of the restrictions aforesaid. This deed was accepted by the association and placed on record. Shortly before the time expired within which the association was to pay the bills for repairs, etc., the association notified Scott that he would have to pay the bills, and asked him to come in and close up the transaction. In the meantime a number of contractors and material men had docketed mechanic's liens to secure their debts. In response to the letter notifying him of the bills, Scott replied as follows:

"Donegal, Nov. 18, 1916.

"Dear Joe:

"Your letter received; after I talked to you Wednesday, Mr. Pitts found $4,500 mechanics' liens against the Horse Show Association, and as there may be a serious question as to whether my 1st mortgage is a prior lien, he advises me to make no payments until the question is settled.

"I will see him in a few days and let you know his opinion, as I (am) compelled to follow his advice.

"Yours very sincerely,

"EDWARD W. SCOTT, Jr."

Scott refused to take the property, and also notified the trustee to sell the property under the deed of trust given to secure him the $5,000, the interest on which was in arrears. This suit was brought to enforce the specific per-

formance of the contract aforesaid, and incidentally to enjoin the sale under the deed of trust last mentioned. Other pertinent facts will appear from the opinion of the court.

*F. C. Moon* and *A. L. Pitts, Jr.,* for the appellant.

*L. T. Hanckel* and *Allen & Walsh,* for the appellee.

BURKS, J. (after making the foregoing statement), delivered the opinion of the court.

This is a suit for the specific performance of a contract for the sale of real estate. The contract is set forth in the statement preceding this opinion. There was a demurrer to the original bill, which was sustained by the trial court, with liberty to the complainant to amend. The amendment was made and the bill as amended was demurred to. This latter demurrer was overruled. The parties took evidence *pro* and *con,* and submitted the case on its merits, and there was a decree for the specific performance of the contract, and from this decree the present appeal was taken.

[1, 2] The granting of the equitable remedy of specific performance is not a matter of right but of discretion, not an arbitrary or capricious, but a sound judicial discretion controlled by established principles of equity, and exercised upon a consideration of all the circumstances of each particular case. 3 Pomeroy's Equity (2d ed), sec. 1404. Moreover, in order to justify a court of equity in compelling the specific performance of a contract, "the contract must be distinctly proved and its terms clearly ascertained. It must be reasonable, certain, legal, mutual, based upon valuable consideration, and the party seeking performance must not have been backward in enforcing his rights, but ready, desirous, prompt and eager." *Darling* v. *Cumming's Ex'r,* 92 Va. 521, 23 S. E. 880.

In the case in judgment, it is insisted, in the first instance, that the contract under consideration is not a contract for the purchase of land, but an option contract; a privilege extended to the appellant to purchase if he so desired. In the preamble to the contract it is stated that the appellant was willing to guarantee the payment for certain improvements, "provided an option is given him to purchase the said property" at a price mentioned, and in the body of the contract it is stated that, "for and in consideration of the option to purchase the property hereinbefore mentioned the said E. W. Scott, Jr., guarantees to pay" for certain improvements to an amount not exceeding $1,800. The contract then proceeds to declare that the Albemarle Horse Show Association "hereby agrees and binds itself to sell to the said E. W. Scott" the property mentioned in the contract, "and said Scott agrees to take said property at said price in accordance with the terms of this contract." While Scott declares in his testimony that he knew nothing of the preparation of this contract or its terms until he was called upon to sign it, the clear weight of the testimony is that it was prepared by counsel employed by him, and that he paid the attorney's fee for its preparation.

[3-5] The contract is to be construed as a whole, and effect given to every provision thereof if possible. No word or paragraph can be omitted in construing the contract if it can be retained and a sensible construction given to the contract as a whole. If, however, there is an inconsistency between the obligatory part of the contract and the recitals therein, effect will be given to the obligatory part rather than to the recitals, as this is regarded as the more vital and important of the two, but the recitals are often helpful in the construction of contracts and throw light on the meaning and intent of the parties. *Dick Co.* v. *Sherwood Letter File Co.*, 157 Ill. 325, 337, 42 N. E. 440. The

appellant insists that he never intended to do anything except take an option to purchase the property, and that the contract was prepared for that purpose. Looking to the obligatory part of the contract alone no option to purchase appears to have been given to the appellant, but an option is given to the Horse Show Association to recede from the contract under given conditions and within a given time. The provision in the preamble, "that an option is given him to purchase," and, in the contract, that "in consideration of the option to purchase the said property hereinafter mentioned," are apparently inconsistent with the obligatory part of the contract by which the Horse Show Association agreed to sell the property to Scott, and Scott agreed to take the property at the price mentioned in the contract. Hence, according to the ordinary rules of construction in the absence of explanation, the obligatory part of the contract would be binding and we should be compelled to hold that Scott had agreed to purchase the property, and not merely taken an option upon it.

But it is manifest from the terms of the contract as a whole that it was the intention of the parties to give to Scott an option to purchase the property. It is not only mentioned in the preamble, but is also expressly mentioned as the consideration of the contract, and Scott insists that such was the agreement of the parties. Color is given to Scott's interpretation of the contract as one of option by the testimony of Mr. Shepherd, president of the Horse Show Association, and one of its chief witnesses. He was asked in his examination in chief this question: "Do you recall, Mr. Shepherd, having discussed this matter with Scott between the day the Horse Show was held and the 18th of September, 1916?" To which he replied: "I recall a general conversation with Mr. Scott the day the papers were signed at Judge Duke's office *wherein he expressed the expectation of completing his purchase*, and

while an effort was to be made to sell stock in the Horse Show Association, he did not expect that it would result in the ability of the association to exercise the right reserved of paying off the indebtedness on the property, and *that he finally expected to take it.* I do not specifically recall any other conversation prior to the day you name." (Italics supplied.) This same idea is further expressed in his cross-examination on that subject.

The circumstances under which this contract was prepared and executed do not show any great amount of deliberation either about its preparation or execution, and it is to be observed that by the change of a single word in the contract it will conform in all respects to the claims made by the appellant. The substitution of the word "if" for the word "and" in the latter part of the paragraph beginning "Witnesseth," would make the contract conform to the claim of the appellant. If this substitution were made, the paragraph would read, "Witnesseth, that for and in consideration of the option to purchase the property hereinafter mentioned, the said E. W. Scott, Jr. guarantees * * * and the said party of the first part hereby agrees and binds itself to sell to the said E. W. Scott, Jr., its property * * * at the price of thirteen thousand, five hundred dollars ($13,500) cash, plus any amount paid for said improvements not in excess of eighteen hundred dollars ($1,800), *if* said Scott agrees to take said property at said price in accordance with the terms of this contract." We do not mean to say that anyone is authorized to make this change, but such prominence was given to the phrase "option to purchase the property" that Scott might well have overlooked the slight difference in the phraseology of the obligatory part of the .contract, and have signed it as an option contract instead of a contract of sale. There is no testimony on the subject except that of Scott who says he understood it to be an option to purchase, and of Cochran who says he

told the attorney for Scott, when drawing the contract, that it "was absolutely binding on Mr. Scott to buy this property at expiration of the sixty days" if they did not pay the repair bills within that time. Cochran gives no satisfactory interpretation whatever of the meaning of the phrase, "option to purchase the property," or of the reasons for its insertion in the contract. Indeed, if his statement of what he said to the draftsman of the deed be correct, the phrase ought not to have been inserted in the contract. Under the circumstances, it may be well doubted whether the contract possesses that certainty and precision which a court of equity demands before it will decree its specific performance.

[6] The further defense is made by the appellant that the Horse Show Association covenanted and agreed to convey the land to him "by deed with general warranty and covenants of title," and that, when they came to tender a conveyance, the deed contained numerous restrictive provisions with reference to the use of the property, which is not a compliance with the contract. He insists that the covenant for a deed with general warranty and covenants of title is not fulfilled by a deed containing onerous building restrictions. It is insisted on behalf of the Horse Show Association that Scott was fully informed of the terms of the deed under which the association held its property, and that when this covenant was made he had full knowledge of these restrictions, and hence that the covenants had no application to the restrictions contained in the deed to the association; that what the association contracted to sell, and Scott agreed to buy, was the association's title to the twenty acres of land, subject to the building restrictions, but free and exempt from any encumbrances or liability for anything placed upon the land by the association. In other words, that we are to look to what the parties had in mind in making the contract, and that as these building re-

67

strictions were put upon the land by the grantor of the association, and could not be removed by the latter, the parties never intended their contract to be affected by said building restrictions, but that Scott bought the title of the association subject to the restrictions. For this position great reliance is placed on the cases of *Riner* v. *Lester*, 121 Va. 563, 93 S. E. 594, and *Sachs* v. *Owings*, 121 Va. 162, 92 S. E. 997; and these cases furnished the foundation of the opinion of the trial judge that the contract should be specifically enforced.

*Riner* v. *Lester, supra,* was a case of an easement of a public road. In the course of the opinion in that case it is said, that "mere knowledge of an encumbrance at the time of contract * * * does not necessarily cut off the defense against the specific execution of a contract for the sale of real estate; but where the circumstances and the conduct of the parties show that the existence of an open, visible, physical encumbrance of the property must have been taken into consideration in fixing the price of the property, the purchaser can neither refuse to complete the purchase nor require an abatement of the purchase price."

In *Sachs* v. *Owings, supra,* the land sold was subject to an easement of a telephone line. Here too, the easement was an open, obvious and physical encumbrance on the property and the purchaser was required to complete his purchase on the ground that the easement must have been taken into consideration in fixing the price.

In *Jordan* v. *Eve,* 31 Gratt. (72 Va.) 1, there was an easement of a public highway. After citing certain New York and Pennsylvania cases, the opinion proceeds: "We are of opinion that these views of the New York and Pennsylvania courts are in accord with the general understanding and usage in Virginia on this subject. With us it has never been supposed that the vendor in conveying his land is required to *make an express* reservation or exception with

respect to highways upon the tract of land, or submit to an abatement of the purchase money. A public highway is generally regarded as a benefit to the land, and whether it was or not the purchaser is presumed to have taken it into consideration, and to have fixed the price with reference to its supposed advantages or disadvantages. If it was once understood as a doctrine of this court that the purchaser is entitled to an abatement, or damages for an easement or encumbrance of this kind, in the language of the New York court, it would open the flood gates of litigation in this State. Besides, it is difficult to say how the damages in such case can be properly estimated. A public highway is a mere easement. It does not take away the right of freehold in the soil; that continues in the owner in the same manner as before the highway was established, subject only to the easement. The owner still retains his property in the mines, quarries, springs of water, timber and earth, not incompatible with the public right of way. He may maintain trespass, ejectment, or waste, in respect to the same, and upon the abandonment or discontinuance of the way, the property and right of enjoyment revert to the proprietor of the soil. Washburn on Easement and Servitude, 228; *Warwick & Barksdale* v. *Mayo,* 15 Gratt. (56 Va.) 545."

[7] It will be observed from the foregoing citations that we have gone no further than to hold that easements which are open, obvious and physical encumbrances upon the property are not within covenants against encumbrances. Even this proposition has not met with universal approval in all of its aspects. *Fossume* v. *Requa,* 218 N. Y. 339, 113 N. E. 330. We are not disposed, however, to recede from our views on this subject, and, besides, the doctrine as to public highways has been so long settled in this State as to become a rule of property. In all of the cases cited above, the encumbrance was physical, open and obvious, and knowledge of its existence was either shown by deeds under which

the grantee claimed, or was, for some reason, presumed, so that resort to parol evidence was unnecessary, and the vendor did not have to rely "on the uncertain testimony of slippery memory," which is the basis of the exclusion of such testimony.

[8] We are now asked to go further, and to hold that it may be shown by parol evidence that, at the time of the purchase of the real estate, the vendee had knowledge of the existence of building restrictions imposed on the property in the deed to his vendor, and hence they were not within the covenant against encumbrances stipulated for in the written contract of sale. While no specific exception to the parol evidence was taken by the appellant, counsel for the Horse Show Association do not deny the existence and scope of the parol evidence rule, and the right of the appellant to rely thereon, but deny its application to the facts of this case. They have urged upon us with great earnestness and ability that the purpose of this evidence was not to vary, alter or contradict the terms of the written contract of the parties, but to show what was the subject matter of the sale and upon what subjects the minds of the parties met; that to identify and show what the parties had in mind in bargaining is not to set up a parol agreement. It is insisted that the subject of the sale is to be determined by the contemplation of the parties, and that this is not dependent upon or derived from the physical condition of the premises but from the bargain of the parties, which may be shown in many ways, ignoring the rule that the bargain of the parties is best ascertained from the written memorial which, as a rule, is to be taken as the sole evidence thereof. It is further said that "to treat the contract in the case at bar as requiring of the association a deed free of restrictions is to say that these parties consciously and solemnly negotiated a bargain which they knew was wholly abortive." In support of their position they cite and quote as follows from the following cases:

*Wilson* v. *Cochran,* 48 Pa. St. 107, 112, 86 Am. Dec. 574-576: "But it has been suggested that this mode of ruling the case is virtually impairing a written covenant by parol evidence. Not at all. The subject matter of the conveyance, its condition and peculiarities, may be explained by parol without any contradiction of a deed. Do we contradict the conveyance of a tract of land when we permit it to be proved by parol that it is covered with timber, is an improved farm, or contains a water-power, or has a private road upon it? If a vendee means to exclude proof upon such subjects, he should take a more special covenant than a general warranty of title. But had he taken, in this instance, a covenant against private ways, it is he who would want the parol evidence to establish the breach Indeed, it is he who opens the door for parol evidence under the general covenant, for he proves the Shultz road by parol, and the plaintiff proves that the defendant bought subject to the road. We see no impeachment or contradiction of the conveyance by such evidence."

*Bacot* v. *Fessenden,* 64 Misc. Rep. 422, 119 N. Y. Supp. 464: "It may further be observed that where parties have expressly contracted that the vendor shall convey free from encumbrances, the vendee might ordinarily be entitled to insist upon the terms of his contract, notwithstanding the fact that at the time of the making of the contract he had notice of the existence of the encumbrances which are urged as ground of rejecting them. But this rule would be subject to the important qualification that: 'If the encumbrance be of a kind which the vendor cannot remove, such as an easement, it is not to be presumed that the purchaser, knowing of the existence of the easement, intended the insertion of a vain provision in the contract. Maupin, Marketability of Titles, sec. 85a.'

"The defendant asks for equitable relief. He seeks a rescission of the contract, and an equitable lien upon the

property for the amount paid by him under the contract. A court of equity will give no heed to the appeal of one who knew, when he signed the contract, that the easements and covenants to which he now objects existed, and were incapable of removal by the other party to the contract."

*Egle* v. *Morrison*, 27 Ohio Cir. Ct. R. 497, affirmed 73 Ohio St. 388, 78 N. E. 1133: "But we think the evidence shows that so far as this building restriction was concerned, Mr. Morrison had knowledge of it. More than that it does not appear that this building restriction was any damage to the property, but rather a benefit, if it were to be used for residence purposes; and Morrison was intending to use it for residence purposes and there was a valuable residence upon it at the time, and in the absence of evidence to the contrary it would be presumed that a restriction of this kind would be a benefit to him. Upon this proposition we cite *Riggs* v. *Pursell*, 66 N. Y. 193, 202, 203, where that question is discussed. But in any event, the fact that he had notice of it deprives him of the right to set it up as a defense. He had notice of it before the contract was signed, and therefore waived any right to complain of this restriction. He took the property and signed the contract with full knowledge that this restriction was upon it. We think this notice can be established by parol evidence * * * Parties cannot defeat contracts of this kind by a mere captious objection. The court cannot help out a party who is simply striving by some technical objection to defeat the right of the vendor to require him to carry out his contract; there must be some substantial objection, and if under a contract of this kind a good title is tendered—a marketable title—it is sufficient."

[9] At last, however, view the case as we may, it always comes back to the proposition of proving a parol waiver, at the time of entering into the contract, of an express term of the written contract. The subject matter

of the contract of sale was clearly defined in the contract. It was the twenty acres of land which the Horse Show Association had purchased of the Redland Land Company. The character of title that the purchaser was to receive was also stipulated for in the contract. He was to have a deed "with general warranty and covenants of title." The subject matter upon which the minds of the parties met, the twenty acres of land, and the terms of purchase are best gathered from the written contract of the parties, which is the sole repository of their agreement. This cannot be varied, altered, or contradicted by parol evidence of any prior or contemporaneous oral waiver or agreement. This subject is reviewed at length, and with great ability by Judge Allen, in the leading case of *Towner* v. *Lucas Ex'r*, 13 Gratt. (54 Va.) 705, which has been consistently followed ever since the opinion was delivered. The principle there announced is applicable to the present case. In that case Towner held bonds executed by Reynolds and others upon which he wished additional security. He time and again sought to get Lucas to sign as surety, and pledged his honor that if Lucas would sign said bonds he should never be required to pay any part of the debt, and that he would give Lucas his written indemnity so as to save him harmless. Lucas finally yielded to the importunities of Towner and signed the bonds. As these bonds became due Towner instituted suits on them, and Lucas, relying on Towner's promise, put in no plea, and consequently Towner obtained judgment against him by default. After suit was instituted on the first bond Lucas applied to Towner for the indemnity he had promised, and Towner advised him to keep quiet and wait awhile. Afterwards Lucas called again in company with his son and demanded the promised indemnity, and was assured by Towner that he would fulfil his promise, but that he could not commit himself, and that Lucas had nothing to fear but his death. After the

judgments were obtained Towner refused to give Lucas the written indemnity or to release him from the judgments. Lucas died and suit was brought by his executors to compel Towner to execute and deliver the promised indemnity and release, and in the meantime to enjoin him from proceeding to enforce the judgments. Towner demurred to and answered the bill. In his answer he said that he was not a party to and had no knowledge of any condition before the complete execution and delivery of the bonds. He denied the alleged promise to Lucas that he should never be required to pay any part of the debt, and that he would give him written indemnity against it. He denied that in any conversation with Lucas he ever admitted any such promise of indemnity. He admitted that there had been conversations, but not such as alleged in the bill. The court directed an issue to try the question whether there had been such promise of release and indemnity. The jury found in favor of Lucas, and the trial court approved the verdict. From that judgment Towner appealed, the main question being as to whether or not parol testimony was admissible to prove the agreement. In a very able opinion by Judge Allen, it was held that the evidence was not admissible, and the judgment of the lower court was reversed. In the course of the opinion it was said: "It is reasoning in a circle to argue that fraud is made out when it is shown by oral testimony that the obligee, contemporaneously with the execution of the bond, promised not to enforce it. Such a principle would nullify the rule, for conceding that such an agreement is proved, or any other contradicting the written instrument, the party seeking to enforce the written agreement according to its terms would always be guilty of fraud. The true question is, was there any such agreement, and this can only be established by legitimate testimony. For reasons founded in wisdom and to prevent frauds and perjuries, the rule of the common

law excludes such oral testimony of the alleged agreement, and as it cannot be proved by legal evidence, the agreement itself in legal contemplation cannot be regarded as existing in fact. Neither a court of law nor of equity can go on the hypothesis of fraud where there is no legal proof of it."

[10, 11] In our view of the case, parol evidence was not admissible to prove an implied waiver, made at the time the contract was entered into, in conflict with the express provision of the written contract. "Proof of knowledge or other proof of the intent of the parties that a particular encumbrance should be excepted from the general terms of the covenant could only be admitted by a violation of the canon of evidence which forbids parol proof to vary the terms of a written contract." *Demars* v. *Koehler*, 62 N. J. Law, 203, 41 Atl. 720, 72 Am. St. Rep. 642. But the result would be the same, even if it were shown that at the time Scott entered into the contract, he had knowledge of the existence of the building restrictions in the deed under which the Horse Show Association held title. "Mere knowledge of an encumbrance at the time of the contract * * * does not necessarily cut off a defense against the specific execution of a contract for the sale of real estate." *Riner* v. *Lester, supra.*

In *Demars* v. *Koehler, supra*, which was an action at law to recover damages for a breach of a covenant against encumbrances, occasioned by the existence of an outstanding term of years, it is said: "Mr. Rawle, conceding that, if there be a real encumbrance, the purchaser's knowledge of its existence will furnish no defense to an action on this covenant, ingeniously suggests that such knowledge may have a material bearing in determining what was the subject matter of the contract." Rawle on Covenants for Title, 95, 96. With equal ingenuity the opinion below denies the right to recover upon this covenant because such

68

an encumbrance, known to the grantee, is not within its terms, and consequently no breach of the covenant. With great respect, I deem the reasoning specious and the conclusion insupportable, for knowledge of the existence of an encumbrance not only does not destroy its inherent character as encumbrance, but may and often does lead to the purchaser's requiring the grantor to protect him by covenants; *Smith* v. *Lloyd*, 29 Mich. 382. When a covenant is made against all encumbrances, without exception, knowledge of the existence of one encumbrance cannot take that encumbrance out of the general terms of the covenant, unless such was the intent of the parties. But knowledge alone does not prove such intent, for a contrary intent is consistent with it. Proof of knowledge or other proof of the intent of the parties that a particular encumbrance should be excepted from the general terms of the covenant could only be admitted by a violation of the canon of evidence which forbids parol proof to vary the terms of a written contract.

"It results that a grantor who fails to except from his covenant against encumbrances one which is known to the grantee, cannot defeat recovery upon that covenant by proof of such knowledge. The grantee is not compelled to require for his protection a special covenant against the known encumbrance, but may rely on the general and unrestricted covenant against all encumbrances."

In the same opinion reference is made to an Indiana case (*Kellum* v. *Berkshire Life Ins. Co.*, 101 Ind. 455), taking a different view of the admissibility of parol evidence, and it is said: "It was upon the authority of the last cited case that a late text-writer relies in enunciating the doctrine that the existence of a lease known to the grantee will not, under a statute transferring the constructive possession to the grantee without attornment by the tenant, operate a breach of the covenant against encumbrances:

Maupin Mar. Tit. 293. But it is obvious that such decisions can have no weight in jurisdictions where the rule forbidding the introduction of parol evidence to vary a written contract is maintained."

*Demars* v. *Koehler* was followed by the later case of *Propper* v. *Colson,* 86 N. J. Eq. 399, 99 Atl. 385, involving the very question we now have under consideration. After deciding that a building restriction is an encumbrance, and, coming to deal with the effect upon a covenant against encumbrances of a known building restriction, the court says: "It is further argued on behalf of the respondents that at the time of his purchase Mr. Propper was fully aware of the existence of the building restrictions upon the land which was bid in by him, and that, therefore, he is to be presumed to have waived any objection to the title because of them. But knowledge by a grantee, at the time of delivery of the deed, that there are outstanding encumbrances upon the property conveyed, is no bar to his right of action on the covenant against encumbrances (*Demars* v. *Koehler,* 62 N. J. Law, 203, 41 Atl. 720, 72 Am. St. Rep. 642; *DeLong* v. *Spring Lake Co.,* 72 N. J. Law, 125, 59 Atl. 1034), and therefore cannot estop him from insisting that he shall receive by the conveyance to him what his vendor contracted to give him; that is, a title free and clear of all encumbrances."

The reasoning of the court in these cases is so satisfactory that we might well accept it, without further citation of authority.

In *Wallach* v. *Riverside Bank,* 206 N. Y. 434, 100 N. E. 50, the vendor agreed to convey by a quit claim deed, and there was an outstanding contingent right of dower. In speaking of the title the purchaser had the right to demand, it was said: "If the plaintiff knew of the defect when the contract was signed, he had the right to presume from its terms that a good title would be made before the law

day. It is a somewhat common practice to agree to sell land without limitation, although both parties know at the time that some outstanding right must be acquired by the vendor in order to enable him to perform his covenant when the law day arrives.

"The defendant insists that the court erred in refusing to find upon its request that the plaintiff knew what a quit claim deed was and the title it would convey; that before the agreement was executed he had been told by the defendant that the only title it could give was such as it had and no more; and that he knew when he signed the contract that there were existing questions respecting the title.

"Assuming, without holding, that there was sufficient uncorroborated evidence to warrant these findings, the written agreement could not be cut down or limited by such facts. Whatever was said before the instrument was signed, being merged therein, became wholly immaterial, and it is not an error of law to refuse to find an immaterial fact even upon uncontradicted evidence."

In the foregoing opinion there is quoted, with approval, the following language from *Moore* v. *Williams*, 115 N. Y., at p. 592, 22 N. E., at p. 234, 5 L. R. A. 654, 12 Am. St. Rep. 844, "a purchaser is never bound to accept a defective title, unless he expressly stipulates to take such title, knowing the defects. His right to an indisputable title, clear of defects and encumbrances, does not depend upon the agreement of the parties, but is given by the law."

In *Mincey* v. *Foster*, 125 N. C. 541, 34 S. E. 644, it was held that specific performance of a contract to purchase mineral interests, where the vendor covenants to warrant the title, will not be enforced where the vendor has no title to a large portion of the land, though the vendee was aware of such want of title when the contract was made. In the course of the opinion it is said that "the mere fact

that the plaintiffs did not have a good title when the option was given does not necessarily affect the transaction, as both they and the defendants might have contemplated a perfection of the title before the day of payment." In that case, the vendors had contracted to convey to the purchaser "a good and sufficient title to the mineral interests."

While conceding the conflict of authority, we think that the cases cited from New Jersey, New York and North Carolina announce the safer and sounder doctrine, certainly on a bill for specific performance.

The Horse Show Association occupies an anomalous position. It comes into a court of equity, asking the specific performance of a written contract for the sale of real estate, and at the same time says that the writing does not correctly express the contract and agreement of the parties thereto. It says, in effect, that the option feature of the contract is meaningless and should be stricken out as surplusage, and that its covenants for title do not mean what they say, but their effect should be construed away by declaring that they had no application to the building restrictions contained in the deed of conveyance to it. We are unable to concur in the conclusion reached by the trial court, and its decree will, therefore, be reversed and the bill of the complainant dismissed, with costs to the appellant in this court and also in the trial court.

*Reversed.*

SIMS, J., *Concurring:*

I concur in the result of the majority opinion, but cannot concur in the following conclusions, namely:

First: That "it may be well doubted whether the contract possesses that certainty and precision" (touching the question of whether it gave the appellant merely an option to buy, or was a binding contract of purchase on his part)

"which a court of equity demands before it will decree its specific performance;" and

Secondly: That parol evidence is inadmissible to restrict the ordinary meaning of the language used in the stipulation in the contract for covenants of title so as to confine the operation of the agreement to the subject matters to which alone, at the time the contract was executed, it was intended by the parties to apply.

1. As to the conclusion first mentioned:

The testimony of the appellant, as stated in the opinion of the learned judge who decided the case in the court below, "is contradicted in so many particulars by so many witnesses that we must * * * reach the conclusion that his memory as to the transaction under discussion is not good." That is to say, when read in the light of the record before us, no weight can be given to appellant's testimony in the consideration of the question of whether the contract was a binding contract of purchase on his part. I think it was clearly such by its express terms. But even if the contract were ambiguous, that is immaterial unless the appellant, the vendee, was misled by that ambiguity, and did in fact put a different meaning upon its terms than the appellee. 6 Pomeroy's Eq. Jur. (3rd ed.) sec. 779. And the evidence, as I think, is clearly to the effect that at the time the contract was executed it was intended to be a binding contract of purchase upon appellant and was so understood by appellant as well as by the appellee, the vendor, and for some time after the contract was executed it was so mutually understood by both parties thereto. As I think, the evidence shows that it was not intended by either of the parties thereto at the time it was executed that the contract should give the appellant merely an option to purchase. That construction of the contract was contended for by appellant for the first time after this suit was instituted. Prior to the suit he assigned wholly

different reasons for his refusal to perform the contract. The record shows, therefore, as I think, that the appellant did not in fact mistake the meaning of the contract in the particular under consideration, at the time the contract was executed. He did not, in fact, then regard it as giving him merely an option to purchase and as not binding him to do so. It seems plain to me, therefore, that it is a case in which a court of equity can and should enforce the specific performance of the contract as a binding contract of purchase on the part of appellant in accordance with his own intention and understanding of it, as well as that of the appellee, at the time it was executed—if it were otherwise enforceable.

2. As to the conclusion secondly mentioned:

The opinion is, on this subject, in accord with the English, but not with the American rule, as established by the great weight of authority.

It may be conceded that the usual and ordinary meaning of the language used in the stipulation in the contract for the covenants of title is for all of the English covenants of title, which include a covenant against all encumbrances. But if the fact was that at the time of the execution of the contract neither party thereto contemplated or intended to contract for a covenant against all encumbrances; and in fact neither party contemplated or intended to contract for a covenant against any of the restrictions constituting the encumbrances in question in the case before us, there would have arisen a case of mutual mistake in the use of the language on that subject employed in the contract.

Moreover, if the further fact was that at the time of the contract the appellant knew that the encumbrances in question existed, and so existed that it was not in the power of the appellee, the vendor, to remove them, so that the appellant knew that if he were to stipulate that such encumbrances should be removed by the vendor, as a con-

dition of the purchase, it would defeat the purchase, and yet went on with the negotiations for and entered into the contract of purchase with no actual objection to the encumbrances, and in fact with the mutual understanding of himself and the vendor, aforesaid that the encumbrances were to remain, I think it would be practically a fraud upon the vendor to allow the appellant afterwards to insist upon the ordinary and usual meaning of the words of the contract so as to escape the specific performance of his actual contract. The appellant should not in equity be heard to say that he did not enter into the contract in good faith intending to execute it. Knowing the existence of the encumbrances, and knowing also that the vendor could not remove them if the appellant intended not to purchase the property in that situation, good faith required of him not to enter into any contract of purchase of it at all. Having entered into the contract of purchase with full knowledge of the situation which he afterwards relies on to render the contract a nullity, he should not in equity be allowed to accomplish that result by giving a meaning to words inadvertently used in the contract, which it is true might under other circumstances be given such meaning, but which were not in fact used, and could not in good faith, with a view to an actual purchase of the property, have been used at the time of the contract with such nullifying meaning.

If such were the facts of this case, I think that, under the well settled doctrine that fraud or mistake furnishes an established exception to the rule against the admissibility of parol evidence to modify the terms of a written contract, parol evidence would be admissible to show the facts of the case. 2 Pomeroy's Eq. Jur. (3rd ed.), secs. 953, 861, 862, 864, 865, 866 and 867.

However, the degree of proof required to entitle a plaintiff to modify the terms of a written instrument by parol

evidence and then have a decree for specific performance of the agreement thus varied and corrected is very high. As said in 2 Pom. Eq. Jur. (3rd ed.), sec. 862: "As in suits for a reformation alone, the evidence must be of the clearest and most convincing nature; the burden of proof is on the plaintiff and he must prove his case * *. It is not sufficient merely to prove a mistake which might be ground for a rescission. The· plaintiff must establish a mistake of such character as entitles him to a reformation * *."

Applying this well established rule to the evidence in the case before us, I am not satisfied that the evidence clearly shows that the appellant knew at the time the contract in question was executed that the real estate which is the subject of the contract would be encumbered when it passed from appellee to him by any restrictions.

. The evidence in the record on this subject does not go beyond showing the following facts, namely: That the Redland Land Corporation, before it sold the real estate aforesaid to the appellee, informed the latter of the various restrictions which it had imposed on all lots sold and intended to impose on all lots it might thereafter sell of its other lands—which restrictions were in no way an encumbrance on, but were of benefit to and enhanced the value of, the real estate involved in this suit. That the Redland Corporation did not indicate any purpose to impose any of those restrictions on the real estate last mentioned. That, as per letter of the last named corporation to Mr. Shepherd, the president of the Albemarle Horse Show Association, of date March 13, 1916, of which appellant was informed on April 25, 1916, the only restrictions which such corporation then proposed to impose on such real estate were the following: "(2) The right to play golf across the land is reserved, and no unnecessary obstructions shall be placed so as to interfere with said

69

right. (3) No structure of any kind shall be erected without first submitting plan of same and having the approval of this company. (4) No nuisance shall be maintained on said property." These, so far as the evidence discloses, were to be personal covenants only. There is no evidence that the Redland Land Corporation then stipulated, or intended to stipulate, or that the appellant then or thereafter knew that it intended to stipulate that the covenants on these subjects should run with the land into the hands of any subsequent purchaser.

Therefore, while I think it is true that the evidence is overwhelming to the effect that the appellant did, as a director of the Albemarle Horse Show Association, approve of the purchase of said real estate subject to the restrictions last mentioned and voted as a director in favor of such purchase; still the evidence wholly fails to show that he knew that such restrictions or any of them were to run with the land and encumber it in the hands of any subsequent purchaser of it.

And in fact the manner in which the restrictions in question in this case came to be inserted in the deed from the Redland Corporation to the Albemarle Horse Show Association and made to run with the land appears from the evidence to have been brought about as follows: Prior to the meetings of the board of directors and stockholders of the Albemarle Horse Show Association, which were held on April 25, 1916, some objection developed to the proposed reservation aforesaid of the right to play golf across the land, if it was to be a permanent right, but not on the part of the appellant. There is no evidence that the latter ever regarded this as anything more than a proposed personal covenant. Mr. Shepherd, in talking over this subject with Mr. Cochran, also an officer of the Albemarle Horse Show Association, "suggested that possibly he might do something with Mr. Livers" (manager and part owner of the

Redland Land Corporation) "to modify in part his views" on the subject. (Record, p. 175.) Mr. Shepherd testifies that, "I did succeed in getting some modification of this golf condition, as indicated in the deed whereby the right does not extend in the event the Horse Show Association ceases to occupy the property for horse show or racing purposes." There is no evidence that the appellant was ever informed of such "modification," being sought or being obtained, nor that such "modification" was ever reported to any board of directors, or stockholders' meeting of the Albemarle Horse Show Association; nor was the form of the deed or the deed itself from the Redland Land Corporation to such association, which was in fact subsequently executed, ever submitted to or approved by any board of directors, or stockholders' meeting of such association so far as the record shows. So far as appears from the record the purchase of the real estate involved in this suit by the Albermarle Horse Show Association of the Redland Corporation was determined upon on April 25, 1916, by action of the board of directors, approved by resolutions of the stockholders' meeting of the association the same day, and such purchase as then determined upon was of the real estate subject only to the restrictions stipulated for in said letter of March 13, 1916—which, as aforesaid, may, in accordance with the evidence have been regarded by appellant as mere personal covenants which did not run with the land. The deed from the Redland Corporation to the said association bears date May 3, 1916, and contains the following "modification" of the said proposed reservation of the right to play golf, namely: "First." * * * that such right is reserved "so long as said land is used by said association for horse show and racing purposes. Second. Should said association discontinue the use of this property for horse show and racing purposes, and sell said property or any part thereof to be used for

other purposes, the reservation set out under the head, of First above, shall cease and the right of playing golf shall thereupon cease, no matter in whom it may be vested. But if said association does make sale of this property, it shall embody in the deed by which it conveys the same, the same restrictions that are now used by said corporation in its regular conveyances * * and which are hereinafter set forth at length." Then follows certain personal covenants of the grantee, one of which is in effect, that the latter will not erect any structure of any kind until the plans have been approved by the grantor in a certain way, or by arbitration as provided for, etc., and the provisions for the restrictions drawn in question in this case which are made covenants which it is provided are to be "made part of any deed by which the said association may convey this land or any part thereof." There is evidence that Mr. Shepherd informed certain of the directors and stockholders in said association of said "modification" and of the covenants in the said deed thereby made to run with the land, but there is no evidence that he or anyone else ever informed the appellant of such "modification" of the terms of purchase aforesaid in accordance with which the association bought the property, or that the appellant or the association, indeed, in its corporate capacity, ever knew prior to this suit of such "modification."

Witnesses for the appellee drew the inference from conversations with appellant on the subject of the advantages of covenants running with the lands, such as those in question in the case, to the whole section being developed, to the effect that at the time of the contract he knew that such covenants were contained in the deed from the Redland Land Corporation aforesaid; but it is not claimed that he ever saw the deed prior to the execution of the contract; and in view of the evidence in the case all the testimony for appellee on this subject may be true and be

entirely consistent with the fact that appellant may have construed the references made in his presence to such covenants as made with respect to the covenants contained in other deeds of the Redland Land Corporation, which were of benefit and not a burden to the land bought by appellant; and may have intended what he said at various times on the same subject to refer to such covenants only.

Witnesses for appellee also draw the inference that appellant knew of the covenants running with the land as provided for in said deed from the fact that he knew of the Redland Land Corporation having the right of veto upon and of its action through Mr. Livers in approving the plans and location of certain structures placed on the property by the said association; but this inference is wholly unwarranted. The personal covenant in the deed on that subject, which is in accord with the proposed covenant on the subject mentioned in the letter aforesaid of March 16, 1916, of which appellant had notice, required such approval; and there is nothing in any action of Mr. Livers of which appellant had knowledge, which is shown in the record, which cannot be attributed merely to the execution of such personal covenant.

I am, therefore, of opinion that the evidence in the record falls short of showing with that degree of clearness and convincing force required, as aforesaid, that the appellant understood at the time he entered into the contract in question that there were any covenants which ran with the land and would be encumbrances upon it in his hands as a purchaser of it, and that he did not intend to contract against all encumbrances, as stipulated, in effect, as the contract. That is to say, I think the evidence fails to measure up to the requisite degree of proof of a mutual mistake in the draft of the contract on this subject, and on that ground I concur in the result of the opinion of the majority.

The case is a close one upon the question of whether the

appellant, by his letter to Mr. Cochran of November 18, 1916, basing his refusal to carry out the contract upon the specific objection to the title of the existence of the mechanics' liens, did not waive and estop himself from afterwards asserting objection to the title on the ground of the existence of the encumbrances aforesaid, under the doctrine of *Cowdery* v. *Greenlee*, 126 Ga. 786, 55 S. E. 918, 8 L. R. A. (N. S.) 137, 142; *Curtis* v. *Aspinwall*, 114 Mass. 187, 19 Am. Rep. 332, 337; and authorities cited in these cases. But the evidence in the record does not definitely and clearly show that the appellant knew of the existence of such encumbrances at the time he wrote the letter to Mr. Cochran of November 18, 1916. The evidence does disclose, however, that in appellant's next communication with Mr. Cochran, which occurred a few days afterwards, when appellant was in Charlottesville, and together with his counsel had an interview with Mr. Cochran at the club, appellant made a refusal in general terms to perform the contract unless he was compelled to do so, specifying no particular grounds for such refusal. This suit was instituted a very short time thereafter, to-wit, on December 7, 1916. In view of the well established doctrine on the subject of waiver and estoppel, requiring definite proof of full knowledge and understanding of his rights on the part of the party to be affected before that doctrine becomes applicable, I do not think that it can operate in this case to bar the appellant from relying on the terms of the contract aforesaid which in substance stipulate that appellant is entitled to a conveyance of title free of all encumbrances.