COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Chief Judge Decker, Judges O'Brien and AtLee
Argued at Fredericksburg, Virginia

DEXIS INTERACTIVE, INC., d/b/a
 DEXIS CONSULTING GROUP

                                                    MEMORANDUM OPINION[*] BY
v.      Record No. 0689-23-4                        JUDGE MARY GRACE O'BRIEN
                                                    JULY 9, 2024

INTERNATIONAL BUSINESS &
 TECHNICAL CONSULTANTS, INC.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Penney S. Azcarate, Judge

Benjamin S. Boyd (Dawn Stern; DLA Piper LLP, on briefs), for
appellant.

Matthew E. Feinberg (PilieroMazza PLLC, on brief), for appellee.

Appellant Dexis Interactive, Inc. (Dexis) and appellee International Business & Technical

Consultants, Inc. (IBTCI) are teaming partners on a federal government contract. During the

contract period, a dispute arose over the share of work that IBTCI is obligated to assign to Dexis

after additional funds were unexpectedly allocated to the contracted project. Dexis sued, but the

court sustained IBTCI's plea in bar and dismissed Dexis's suit with prejudice, finding that the plain

language of the contract did not support Dexis's claims. Dexis appeals.

BACKGROUND[1]

On June 11, 2019, Dexis and IBTCI agreed to pursue a federal government contract with the

United States Agency for International Development (USAID). IBTCI would serve as the prime

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The material facts dispositive of this appeal are undisputed.

contractor and Dexis as a subcontractor for the federal contract. The parties were successful in their bid, and IBTCI executed a "Prime Contract" with USAID on October 15, 2019, valued at approximately $70,000,000.

IBTCI and Dexis entered into a subcontract to begin on October 15, 2019, and to run until October 14, 2024. The subcontract incorporated by reference a "Subcontractor's Statement of Work." The statement of work set a target workshare for Dexis of 40%, with a maximum of 41.5% and a floor of 38.5%, "as well as 100% of the total [d]irect costs associated with TDM[2] for that labor over the life of the contract," and IBTCI was obligated to "make a good faith effort to achieve the agreed-upon workshare." The subcontract estimated the total cost of the work Dexis was to perform at $24,776,518, with a fixed fee for Dexis of $1,238,826, for a total subcontract value of $26,015,344. The statement of work and the subcontract contain no provisions about allocation of work in excess of total subcontract value.

The subcontract expressly stated that the "[t]otal Subcontract Costs shall not exceed the total cost and fee" provided above and that the "total cost stated above may not be adjusted without written modification signed by IBTCI." The subcontract included an "Order of Precedence" provision providing that "[i]n the event of an inconsistency or conflict between documents, the inconsistency shall be resolved by giving precedence" first to the subcontract, then to the statement of work, then to the other parts of the subcontract in a specified order. The subcontract further stated that it is "the complete and exclusive statement thereof between the parties and that it supersedes and merges all prior proposals and understandings, and all other agreements, whether oral or written, between the parties" and that the contract between them "shall be governed only by the terms and conditions of this Agreement."

---

[2] TDM is a "USAID approved Technical Directions Memorandum."

On February 3, 2022—more than two years after Dexis and IBTCI entered into the subcontract—USAID notified IBTCI that it intended to increase the value of the prime contract from the initial $70,000,000 by an additional $55,000,000. A dispute arose between the parties as to what share of the additional contract value that IBTCI would allocate to Dexis. On February 7, 2022, IBTCI notified Dexis that its workshare of the additional $55,000,000 provided by USAID would be 15%.

Dexis objected to the 15% workshare and invoked the subcontract's dispute resolution clause. When the parties were unable to resolve the dispute, Dexis sued IBTCI. Dexis alleged anticipatory breach of contract and sought declaratory judgment that it was entitled to a 40% workshare of the additional $55,000,000 provided by USAID, an injunction ordering IBTCI to allocate a 40% workshare of the new funding to Dexis, and specific performance.

IBTCI filed a plea in bar denying that Dexis was entitled to a 40% workshare of the additional funds. IBTCI argued that the subcontract itself contradicted Dexis's claims, and so Dexis failed to present a justiciable claim.[3] In response, Dexis argued that the plea in bar was not a proper dispositive motion because it constituted "an impermissible plea of the general issue" and violated Rule 3:8(a). *See* Rule 3:8(a) ("A general denial of the entire complaint or plea of the general issue is not permitted.").

The court sustained IBTCI's plea in bar and dismissed Dexis's complaint with prejudice. The court found that because IBTCI's defense rested not on disputed facts, but on the text of the subcontract, a plea in bar was proper. Interpreting the plain language of the subcontract itself, the court concluded that the subcontract did not cover the additional funding beyond the $70,000,000

---

[3] IBTCI also argued that Dexis's claim was "premised upon an unenforceable agreement to agree" and that Dexis was not entitled to equitable relief. IBTCI reasserts those arguments on appeal. Because of our ruling that the plain language of the contract does not support Dexis's claim, we do not reach this issue.

originally allocated, that it could not "read that into the contract when it is clear on its own terms," and that "because th[e] subcontract speaks for itself, there is not an actual controversy between the parties" suitable for declaratory judgment. Additionally, the court rejected Dexis's prayer for specific performance on the ground that such relief "is not available as a remedy in lawsuits involving contracts for services of labor," and rejected its request for injunctive relief, reasoning that even if Dexis had a valid claim, there would be an adequate remedy at law.

ANALYSIS

Dexis raises ten assignments of error, arguing that IBTCI's plea in bar was an improper plea of the general issue, that the court misinterpreted the subcontract, and that the court erred by finding that there was no justiciable controversy and that Dexis was not entitled to injunctive relief or specific performance.

"In this case, as in all others, we seek to decide cases, 'on the best and narrowest ground available' from the record." *Foltz v. Commonwealth*, 58 Va. App. 107, 114 (2011) (en banc) (quoting *Kirby v. Commonwealth*, 50 Va. App. 691, 698 n.2 (2007)), *aff'd*, 284 Va. 467 (2012). "This approach encourages 'judicial self-restraint' by avoiding the resolution of broad, reasonably debatable legal issues when narrower, less debatable legal issues fully dispose of the appeal before the court." *Id.* (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 566 (2009)); *see also Theologis v. Weiler*, 76 Va. App. 596, 603, 605 n.5 (2023) (noting the "large number of issues presented" in the appeal, finding that the best and narrowest ground on which to decide the case was on the merits, and "express[ing] no opinion on the other issues" raised by the appellant, including whether the issues "could be reached on demurrer").

With these principles in mind, we find that the best and narrowest ground on which to decide this appeal is that the plain language of the subcontract does not support Dexis's claims, and hold that IBTCI's contractual obligation to allocate approximately 40% of the project workshare to

Dexis extended only to the $70,000,000 in funding originally provided by USAID under the prime contract.

"Basic contract interpretation principles dictate that '[w]hen the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning.'" *Orthopaedic & Spine Ctr. v. Muller Martini Mfg. Corp.*, 61 Va. App. 482, 490 (2013) (alteration in original) (quoting *Env't Staffing Acquisition Corp. v. B & R Constr. Mgmt.*, 283 Va. 787, 793 (2012)). "It is a basic tenet of Virginia law that the courts, when interpreting a contract, 'construe it as written' and do 'not add terms the parties themselves did not include.'" *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 283 Va. 624, 636 (2012) (quoting *Landmark HHH, LLC v. Gi Hwa Park*, 277 Va. 50, 57 (2009)). The "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning," and "[n]o word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 284 Va. 382, 392 (2012) (second alteration in original) (quoting *D.C. McClain, Inc. v. Arlington Cnty.*, 249 Va. 131, 135-36 (1995)). Appellate courts review issues of contract interpretation de novo and have an "equal opportunity to consider the words of the contract within the four corners of the instrument itself." *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 631 (2002); *see also City of Chesapeake v. Dominion Securityplus Self Storage, LLC*, 291 Va. 327, 334 (2016).

By its own description, the subcontract between Dexis and IBTCI is a "Cost-Plus-Fixed-Fee . . . Completion type" contract. A "cost-plus-fixed-fee contract," as defined in the Code of Federal Regulations, "is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is *fixed at the inception of the contract*." 48 C.F.R. § 16.306(a) (emphasis added). A "completion type" or "completion form" cost-plus-fixed-fee contract "describes a typical

contract in which the scope of work is stated as a definite goal usually resulting in some end product." *Fluor Enters., Inc. v. United States*, 64 Fed. Cl. 461, 467 (2005); *see also* 48 C.F.R. § 16.306(d)(1). The subcontract sets a five-year term from October 15, 2019 to October 14, 2024 and provides that the "estimated cost for the performance of the work required under th[e] subcontract, exclusive of fixed fee is $24,776,518." The "fixed fee" to be earned by Dexis is $1,238,826, for a total subcontract value of $26,015,344. The subcontract expressly states that the "Total Subcontract Costs shall not exceed the total cost and fee listed above" and that the "total cost stated above may not be adjusted without written modification signed by IBTCI." As IBTCI correctly argues, a "'not to exceed' value means just that—the amount disclosed is the maximum amount to be paid to the subcontractor." Thus, on its face, the subcontract entitles Dexis to $26,015,344 (performance cost plus fixed fee) and does not obligate IBTCI to allocate to Dexis any portion of additional work that it may receive from USAID.

Dexis sees things differently and relies mainly on two provisions in the statement of work, which was incorporated by reference into the subcontract. In its view, the clause in the statement of work that IBTCI would "make a good faith effort to achieve the agreed-upon workshare" obligates IBTCI to "'make a good faith effort' to provide Dexis with a targeted workshare of 40% of the total work under the USAID contract," and not merely 40% of the initial allocation from USAID contemplated when the parties entered into the subcontract. Dexis also argues that the provision in the statement of work setting the workshare to be "a range of no less than 38.5% up to 41.5%, as well as 100% of the total Direct costs associated with TDM for that labor *over the life of the contract*" supports its claim to a 40% share of *all* the work USAID allocates to IBTCI over the five-year life of the contract, including the additional $55,000,000. (Emphasis added).

We do not, however, read contract terms in isolation. *See TM Delmarva Power, LLC v. NCP of Va., LLC*, 263 Va. 116, 119 (2001). Rather, "contracts must be considered as a whole

- 6 -

'without giving emphasis to isolated terms.'" *Id.* (quoting *American Spirit Ins. Co. v. Owens*, 261 Va. 270, 275 (2001)). Considering the subcontract as a whole, Dexis's arguments are unpersuasive. The statement of work itself describes the $26,015,344 allocated to Dexis as the "subcontract ceiling" and describes the 41.5% maximum workshare as the basis upon which this ceiling was calculated.[4] This provides the relevant lens under which we view the "good faith" and "life of the contract" provisions in the statement of work. Viewing those provisions through that lens, they do not support Dexis's arguments that IBTCI was obliged to provide a portion of any additional work that might be allocated by USAID beyond that envisioned at the outset of the subcontract.

Additionally, the subcontract includes an "Order of Precedence" provision stating that "[i]n the event of an inconsistency or conflict between the documents" comprising the subcontract, "the inconsistency shall be resolved by giving precedence" first to the subcontract, then to the statement of work, and then to certain other documents in a specified order. By the straightforward terms of the subcontract's "Order of Precedence" clause, the statement of work must yield to the provisions in the subcontract. And the subcontract explicitly states that the "Total Subcontract Costs shall not exceed" $26,015,344 and that the "total cost stated above may not be adjusted without written modification signed by IBTCI."

Thus, when "construed as a whole" and "effect [is] given to every provision," the plain, unambiguous language of the subcontract sets the value of Dexis's workshare at $26,015,344 (inclusive of its $1,238,826 fixed fee) as a ceiling which "may not be adjusted without [a] written modification signed by IBTCI" and does not establish a contractual obligation for IBTCI to allocate approximately 40% of the workshare of the additional $55,000,000 provided by USAID to Dexis. *Ames v. American Nat'l Bank of Portsmouth*, 163 Va. 1, 38-39 (1934) (quoting *Scott v. Albemarle Horse Show Ass'n*, 128 Va. 517, 526 (1920)).

---

[4] *See* Subcontract Schedule A-1, "illustrat[ing] this workshare model" and using a "41.5% workshare" "to determine the subcontract ceiling."

## CONCLUSION

For these reasons, we affirm the court's judgment.

*Affirmed.*