# Richmond.

## Virginian Railway Company v. J. T. Hood.

January 17, 1929.

Absent, Chichester, J.

The opinion states the case.

*Williams, Loyall & Taylor, N. S. Turnbull, Jr.*, and *Martin & Wingfield*, for the plaintiff in error.

*George E. Allen* and *P. G. Jefferson*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

This is an action by motion to recover damages occasioned by the flooding of certain lands in Nottoway county. Designating the parties as they were designated in the trial court, the defendant, Virginian Railway Company, in 1922, undertook the construction of a dam in Nottoway river to impound water for its engines. Before undertaking this work, surveys indicated that a part of the lower portion of plaintiff's land would probably be flooded, although the dam which it proposed to build was to be placed some distance below. Plaintiff's holding consisted of one tract of about 502.5 acres lying along the north shore of this river, and in the main above what is known in the record as Barton's bridge. Before the dam was built the railway company approached Mr. Hood, explained to him the character of the work which it proposed to undertake and the purposes which it had in view, all of which was stated in detail and fully understood. After some negotiations, it did purchase, for $1,396.50, the lower end of the 502.5-acre tract, in amount 16.63 acres. This purchase lay just below the bridge. In the deed therefor, of date October 2, 1922, is this convenant: "It is intended hereby that the above conveyance shall include the Nottoway river bed and channel, and all water and water rights within the boundaries above set out; and it is understood that the consideration above named shall be in full satisfaction of all damages resulting from the flooding of the said land hereby conveyed."

After the dam was built the level of the water was raised, exactly to what extent it is not easy to say. From the plaintiff's testimony, it would appear that the flood at Barton's bridge was about two feet, while Mr. Charlton, an engineer who had made the necessary surveys, puts the raise at about a foot and a half. It is fair to assume that it was somewhere within these limits.

To carry off water from a spring and to drain some nearby marsh land, plaintiff had built a blind ditch, or subsurface drain. Originally it came out of the river bank at a point six or eight inches above the water level as it stood before the dam was built, and seventy-five or 100 yards above the bridge.

To what extent has it been submerged? Counsel for plaintiff, in his cross-examination of Mr. Gee, has thus stated his view of what the evidence shows:

"Mr. Gee, the testimony shows that this blind ditch is made by using two timbers and then putting a board on top of those timbers, and then a railroad tie on top of those boards, which places the tie on top of the ditch, and then the water stands half of the time half way up that tie so as to put it completely above the mouth of the ditch which empties into the river. Now if that be the case, would you still say whether the land is damaged or not?"

In other words, the water now covers the mouth of this ditch to a depth of a few inches. This it is said dams back the flow, shuts off drainage and has inflicted the injuries suffered. Nowhere along the plaintiff's land has there been any overflow caused by the dam, the river bank being from three to seven feet high. Plaintiff was asked:

"Q. Aren't they (the river banks) several feet above the level of the water now?

"A. Yes; they are above the water."

■ ■ It is not easy to see how the flow from a blind ditch or drain which opens just a few inches under the surface of the water can be seriously impeded. Through it ran the full flow of a spring, and the ditch itself where it reached the river was three feet or more underground. To stop its flow the river surface would have to approximate the elevation of the spring. If this drain has ceased to function, it is more reasonable to assume that it has been clogged by extraneous matter than that its flow has been checked by this slight raise in the river level, and we do know, as a matter of common knowledge, that blind ditches are sometimes clogged by the washing in of earth and trash.

But let us, in harmony with the jury's views, assume that the trouble came from the change in the water level. What of the covenant of release set out in the deed of October 2, 1922?

■ There are certain principles to be remembered in the construction of contracts in deeds and elsewhere, so universally recognized that citation of authorities to sustain them is but a work of supererogation. When plain upon their face, they are to be construed as written, and the language used is to be taken in its ordinary significance unless it appears from the context that it was not so intended. They are to be construed as a whole. Their provisions are to be harmonized when possible, effect is to be given to every stipulation when it can reasonably be done, while the condition of the parties and the circumstances under which they were executed should be considered. In doubtful cases, the grantor bears the burden. The deed of October 2, 1922, conveyed the sixteen acre tract in absolute estate and the purchaser had the right to flood it at its election, without let or hindrance. It would be meaning-

less and futile to assume that it was necessary to cove-
nant against injury to the land bought, and since dam-
age to the land purchased could not have been in the
minds of the parties, damage to some other land must
have been, and there was no other land in which any
of them had any interest at all except that portion of
the 500 acre tract still held by the plaintiff. Any other
construction of this release would leave it destitute
of purpose; it might as well not have been written at
all; and to so hold is to violate one of the fundamental
canons of construction.

In *Eley* v. *Twin State Gas & Elec. Co.*, 80 N. H. 428,
117 Atl. 817, this contract provision came under con-
struction: "\* \* all the interest said grantors have
in said river with the right of flowage to lands of said
grantees adjoining, reserving the right to claim to
nominal damages, \* \*." It was suggested that the
word "grantees" should be read "grantors." The
court, in the course of its opinion, said: "In any
permissible view of the meaning of the deed as the
evidence stands, all the defendant owns, as against the
plaintiff's estate, is a right to raise the water and man-
age its dam in a reasonable way."

In *Co-operative Vineyards Co.* v. *Ft. Stockton Irr.
Lands Co.* (Tex. Civ. App.), 158 S. W. 1191, it was
said: "The deed under which plaintiff deraigns title
is the charter of his rights, and defendant's liability to
it must be measured by its terms. Appellee could sell
its land or not, as it pleased, and upon such conditions
as it saw fit, and appellant in accepting the title with
the covenant in the deed from appellee 'that the vendee
waives any and all claims which might hereafter accrue
for loss or damage by reason of seepage, leakage or
breakage, or overflow from said canals, flumes or later-
als of the vendor,' could not acquire a possessory right

in the land inconsistent therewith; and there being no claim that appellee was guilty of any gross or willful negligence, there could be no liability for damages occasioned in the manner alleged by appellant." *Larimer County Canal, etc., Co.* v. *Herring*, 24 Colo. App. 456, 135 Pac. 118.

In *Simpson* v. *Wabash R. Co.*, 145 Mo. 64, 46 S. W. 739, is this headnote sustained by the text: "Where the owner of a lot issues a license to flood it, he cannot complain if the configuration of the ground is such that an adjoining lot owned by him is flooded in attempting to flood the one specified in the license, but he may exclude the water from that lot."

In *New River Mineral Co.* v. *Painter*, 100 Va. 507, 42 S. E. 300, it was held that the release of a party from damages for washing ore in the waters of a certain branch did not carry with it the right to increase its flow, and to use it so augmented, but was sufficient to protect the grantee from damage done in washing ore in this stream as it ran in the beginning. That is to say, the parties must have intended this contract to apply to conditions as they stood as of the date of its execution.

In *Wright* v. *City of Richmond*, 146 Va. 835, 132 S. E. 707, it was necessary to construe this release: "All claim against the city of Richmond is hereby waived arising from the extension and grading of Carlisle avenue, adjacent to and abutting my property." The court said: "We have no difficulty in deciding that the waiver, in legal contemplation of the parties when this deed was executed, extended to and had the effect of releasing the city from all such damages resulting to the grantor from extending and grading the street or avenue across her property, as might naturally be expected to follow, assuming that the city would do

its work in the usual and ordinary manner, and with reasonable skill."

■ From this it appears that these general releases are upheld in Virginia so long as there is no negligence, and when the things done might naturally have been expected at the time the contract was made.

*Thomas* v. *Greenville-Carolina Power Company*, 105 S. C. 268, 89 S. E. 552, is a case in which other tracts of land owned by the plaintiff were flooded. Here there was but one tract and the release must, of necessity, have referred to it, if it referred to anything at all.

In *Stadler* v. *Missouri Power Co.* (C. C. A.), 139 Fed. 305, the power company leased to Stadler certain lands which it had bought from him for grazing purposes. There flooding was contemplated and a release from damages in general terms was executed by Stadler. Other lands of his were afterwards affected. The court was of opinion that there was no meeting of minds which carried this release to other lands—indeed, that the parties were talking about different lots and so the claim for damage was sustained.

■ It should be readily conceded that no one of these cases is controlling authority. The facts differ materially from this in judgment, and each case turns largely upon the facts, but they do, in a general way, show how these general releases are to be construed.

The damage must not be unreasonable, it must not be negligently inflicted and it must be within the field which the contract, fairly construed, was intended to cover.

■ The bed of the river around and above this land purchase was almost level, and it was patent, upon most casual observation, that to flood it or any part of it would of necessity raise the level of the water upstream. This contingency and the possibility of rea-

sonable damages must have been in the minds of the parties when the negotiations for purchase were in progress. The grantee could suffer no damage from the flooding of its own land, and the grantor, who had parted with all interest therein, was powerless to prevent any reasonable and proper use of it. Certainly some damage was released to the grantee, and the only damage anywhere suggested in the record is that which flows from the damming back of the water. If this is not what was meant, nothing was. Water was not unreasonably impounded, and the dam was not negligently constructed.

We hold that the language is plain upon its face and relieves the railway company from damages incident to such proper and natural use of its own land as must have been contemplated when the deed of October 2, 1922, was executed.

In the view which we have taken of this case, it is not necessary to discuss other assignments of error. The judgment complained of must be reversed, and it is so ordered, and final judgment must be entered for the defendant.

*Reversed.*