COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Fitzpatrick, Judges Elder and Kelsey
Argued at Richmond, Virginia


JOSEPH RICHARD VILSECK, JR.
                                                            OPINION BY
v.        Record No. 1207-04-2                    JUDGE D. ARTHUR KELSEY
                                                            MAY 17, 2005
SHIRLEY NEALE VILSECK


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Gary A. Hicks, Judge

James C. Roberts (Peter A. Gilbert; Troutman Sanders LLP,
on briefs), for appellant.

Donald K. Butler (Mary Beth Joachim; ButlerCook LLP, on
brief), for appellee.


Joseph Richard Vilseck, Jr. appeals a final divorce decree that equitably distributed

property he claims to have acquired and titled separately during the marriage.  The plain meaning

of his premarital agreement, Vilseck argues, excluded this property from equitable distribution.

The chancellor reached the opposite conclusion, holding that the plain meaning of the agreement

included such property within the equitable distribution scheme.  Upon our *de novo* review of the

agreement, we find the contractual language ambiguous and remand the case for the chancellor

to consider the parties' extrinsic evidence in support of their respective interpretations.

I.

A.   THE PREMARITAL AGREEMENT

Joseph Vilseck married Shirley Neale Wiatt in 1983.  Both had been married before and

had children.  Before marrying each other, they retained legal counsel and negotiated a

premarital agreement.  As most do, the agreement begins with a prefatory series of recitals

followed by the transition phrase "Now, therefore . . . Vilseck and Wiatt agree as follows."

Some twenty numbered paragraphs, many with subparagraphs, then go into detail setting out the

parties' contractual rights and liabilities.[1]

The introductory recitals state that each party was "aware that the other owns substantial

assets" and each

> *acquired* all of his or her "Separate Property," as defined herein,
> independently of and without the assistance of the other. Each is
> aware of the rights and interests in and to the Separate Property of
> the other to which he or she might otherwise be entitled by *virtue
> of the marriage.* (Emphasis added).

Thus, whatever the meaning of "'Separate Property,' as defined herein," the context of the recital

limited it to separate property owned by either party before marriage. In this respect, the

contractual meaning parallels the usual meaning employed by the equitable distribution statute.

See Code § 20-107.3(A)(1)(i) (defining separate property as including all property acquired

"before the marriage").

One of the rights each party became entitled to "by virtue of the marriage" was the legal

capacity to renounce the other's will and to claim minimum threshold rights of inheritance in the

deceased spouse's separate property.[2] As it concerns premarital property, therefore, the phrase

"Separate Property" in the recital demonstrates the parties' intent to shield such property from

spousal inheritance rights. That result clears the way for paragraph 8, entitled "Provisions Upon

Death of Vilseck," which sets out inheritance rights Wiatt would have by contract (not by "virtue

---

[1] For convenience sake, Joseph Richard Vilseck, Jr. will be referred to as Vilseck. Shirley Neale Vilseck will be referred to by her maiden name, Wiatt, as used in the premarital agreement.

[2] Prior to 1991, when the legislature enacted statutory election provisions in Code §§ 64.1-13 to 64.1-16.4, the doctrines of dower and curtesy guaranteed certain minimum inheritance rights to the surviving spouse. See Chappell v. Perkins, 266 Va. 413, 417, 587 S.E.2d 584, 586 (2003).

of the marriage") under various scenarios depending on who died first, the number of surviving children, and the value of the estate.

The premarital agreement also includes a provision entitled "Retention of Separate Property." Paragraphs 2(A) and (B) read:

> Except as provided herein, each of the parties shall retain sole ownership of all of his or her Separate Property and shall have the exclusive right to sell, convey . . . or otherwise dispose of any and all of his or her Separate Property and any right or interest therein during lifetime by *inter vivos* transfer or upon death by will, or by any other method of disposition, free from interference by or of any right or interest of the other therein, in such manner as shall be determined in his or her sole discretion and as if the marriage had not taken place.
>
> As used in this agreement, the term "Separate Property" shall mean all real and personal property of each of the parties and all rights and interests in such property of whatever kind and wherever located, regardless of whether such property is now owned or hereafter acquired.

Except for the very last clause of the last sentence, these provisions fit comfortably within the statutory meaning of separate property and the context of the earlier recital protecting premarital property from spousal inheritance claims.

By recognizing the possibility of property "hereafter acquired," however, the last clause of paragraph 2(B) implies that contractual "Separate Property" can be acquired at any time, even during marriage. That would not be ordinarily true of statutory separate property under Code § 20-107.3(A)(1)(i), which includes only property acquired "before the marriage." But it could be true for inherited property received during marriage, Code § 20-107.3(A)(1)(ii), property acquired in exchange for, or from the proceeds of, preexisting separate property, Code § 20-107.3(A)(1)(iii), and any separate property component of hybrid property, Code § 20-107.3(A)(1)(iv) & (A)(3).

- 3 -

Paragraph 5 of the premarital agreement deals with jointly titled property and deems each party to own an undivided half interest in such property "[n]otwithstanding any other provisions of this agreement" to the contrary. Under this provision, no matter how one interprets separate property, once it has been jointly titled it becomes jointly owned in equal shares.

Paragraph 7 addresses "Spousal Support and Monetary Award." It states that, despite the upcoming nuptials, the parties recognize the possibility of a divorce within five years of marriage. If that happened, Wiatt waives under paragraph 7(B)(1) any "spousal support or monetary award (whether payable in a lump sum or in periodic payments or over a period of time in fixed amounts) which Wiatt might otherwise have the right to receive in accordance with applicable law." If they divorce after five years, paragraph 7(C) provides that Wiatt would receive whatever the law allowed "subject, however, to all of the provisions of this agreement, including, without limitation, the definition of 'Separate Property' contained herein."

## B. THE TRIAL COURT PROCEEDINGS

Wiatt filed for divorce in 1999 and requested spousal support and an equitable distribution award pursuant to Code § 20-107.3. In response, Vilseck asserted that the premarital agreement should be interpreted to deem all property acquired and titled individually during the marriage to be characterized as contractual "Separate Property" wholly immune from the equitable distribution statute.

Wiatt argued that the agreement addressed "Separate Property" to protect premarital property from spousal inheritance claims. The contractual reference to property "hereinafter acquired," Wiatt reasoned, merely broadened the protection to property purchased during the marriage with premarital separate funds, property inherited during marriage, and whatever separate property components existed within hybrid property — each tracking the limited

categories of statutory separate property that could be acquired during marriage. See Code § 20-107.3(A)(1)(ii), (A)(1)(iii), (A)(1)(iv) & (A)(3).

Both Vilseck and Wiatt claimed that their mutually exclusive interpretations had the textual support of the plain meaning of the premarital agreement. But each was also quick to acknowledge, however, that extrinsic evidence should be considered if the chancellor rejected their plain meaning arguments and deemed the agreement ambiguous.

The chancellor held the agreement, as a matter of law, unambiguously endorsed Wiatt's interpretation of "Separate Property" and thus found no need to consider any extrinsic evidence from either party. "While the use of the phrase 'Separate Property' may be ambiguous on the face of the document," the chancellor held, "the plain meaning of these words are found [sic] by a reading of the whole instrument." After ruling on the meaning of the premarital agreement, the chancellor appointed a judge *pro tempore* to conduct an evidentiary hearing to distribute the marital assets pursuant to the approved interpretation.

## II.

On appeal, Vilseck argues that the plain meaning of the premarital agreement supports only his interpretation and expressly rejects the interpretation advanced by Wiatt and adopted by the chancellor. In the alternative, Vilseck contends, "if the Court, in its *de novo* review, determines that the language of the agreement is ambiguous, it should remand the case for the presentation of evidence." We reject Vilseck's primary argument, but accept his alternative contention.

Under settled principles, the "law presumes property acquired during a marriage to be marital, not separate, property." Smith v. Smith, 43 Va. App. 279, 286-87, 597 S.E.2d 250, 254 (2004) (citing Code § 20-107.3(A)(2)). Contractual parties "may defeat that presumption by agreement." Id. "Contracts seeking to do this before marriage, like the prenuptial agreement in

this case, should be interpreted and enforced no differently than any other type of contract." Id. (citations omitted). "Thus, we employ 'rules of construction applicable to contracts generally, including the application of the plain meaning of unambiguous contractual terms.'" Id. (quoting Pysell v. Keck, 263 Va. 457, 460, 559 S.E.2d 677, 678 (2002); King v. King, 40 Va. App. 200, 206, 578 S.E.2d 806, 809 (2003)).

Virginia law resolves "contractual vagaries in one of three ways." Smith, 43 Va. App. at 287, 597 S.E.2d at 254. "First, if no patent or latent ambiguities exist, a court should enforce the plain meaning of the contractual language without resort to extrinsic evidence." Id. "Second, if an ambiguity exists, a court should still enforce the contract if the real meaning of the ambiguous provision can be discerned from extrinsic evidence." Id. "Third, if an ambiguity renders the alleged agreement too indefinite — even after the consideration of extrinsic evidence — for the court to determine the parties' intent, the contract cannot be enforced due to the absence of any discernable meeting of the minds." Id.[3]

An agreement should be deemed "ambiguous if it may be understood in more than one way or when it refers to two or more things at the same time." Video Zone, Inc. v. KF&F Props., 267 Va. 621, 625, 594 S.E.2d 921, 923 (2004) (citations and internal quotation marks omitted). Such a conclusion, however, does not follow "simply because the parties to the contract disagree about the meaning of its language." Pocahontas Mining L.L.C. v. Jewell Ridge Coal Corp., 263 Va. 169, 173, 556 S.E.2d 769, 771 (2002). Instead, it must be objectively reasonable to understand the contractual language "in more than one way" or to conclude that it "refers to two

---

[3] Absent the necessity to consider extrinsic evidence, "appellate courts review trial court interpretations of contractual texts *de novo* because we have an equal opportunity to consider the words within the four corners of the disputed provision." Smith, 43 Va. App. at 288 n.2, 597 S.E.2d 255 n.2 (citations and internal quotation marks omitted). As a result, "whether a contract provision is ambiguous presents a question of law, not of fact." Video Zone, Inc. v. KF&F Props., 267 Va. 621, 625, 594 S.E.2d 921, 923 (2004).

or more things at once." Id.[4] Our task on appeal is not to determine which of the competing interpretations is the better of the two — but whether both, though contradictory, are nonetheless reasonable.

In this case, we find the plain meaning of the agreement is not nearly as plain as either party asserts. To begin with, the definition of "Separate Property" in paragraph 2(B) does not say (as Vilseck translates it to say) that *all* property separately acquired and titled during marriage must necessarily be placed outside the reach of the equitable distribution statute. The actual text says considerably less than that. To be sure, the ostensible definition involves somewhat of a tautology, for it states "the term 'Separate Property' shall mean all real and personal property of each of the parties" — which is little more than saying separate property is property of each separate party.

True enough, the "property of each" tautology needs no explanation for property owned separately prior to the marriage. Her car is hers, his boat is his, and so on. After marriage, however, it is not so easy to distinguish between the two. But that is exactly what the remainder of the sentence requires, for it adds the possibility that, whatever contractual "Separate Property" may be, it can be property either "now owned or hereafter acquired."

_____

[4] If an obvious conflict exists between "prefatory or recital language" and "the obligatory provisions" in an otherwise unambiguous contract, Virginia law enforces the latter, United Va. Bank/Nat. v. Best, 223 Va. 112, 115, 286 S.E.2d 221, 223 (1982), because "this is regarded as the more vital and important of the two," Scott v. Albemarle Horse Show Ass'n, 128 Va. 517, 526, 104 S.E. 842, 846 (1920). Even so, the recitals are "often helpful in the construction of contracts and throw light on the meaning and intent of the parties." Scott, 128 Va. at 526, 104 S.E. at 846. For this reason, recitals may be considered in determining whether the contract as a whole suffers from a patent ambiguity warranting the admission of extrinsic evidence. See id. at 527-29, 104 S.E. at 846 (considering the "preamble" along with extrinsic evidence to resolve contractual ambiguity); cf. Miller v. Miller, 555 P.2d 1246, 1250 (Or. 1976) ("If, in the particular fact context, the recitals appear to be inconsistent with the operative clauses, as a matter of common sense there is an ambiguity or question about the intent of the parties, and evidence of the circumstances under which the contract was made should therefore be admitted as an aid in determining the parties' assumed or actual intent.").

On brief, Vilseck fills in this ambiguity with the caveat that contractual "Separate Property" acquired during marriage applies only to property separately acquired and titled. At oral argument, Vilseck added that fungible salary income from his medical practice, though not subject to a document of title, would be "Separate Property" as soon as he placed it in his separate checking account. That assertion, which we need not dwell on, merely begs the question. Suffice it to say, nothing in the contractual text states that separately titled property has a contractual immunity from equitable distribution.

Vilseck disagrees, arguing that any interpretation other than his would render the contractual definition of "Separate Property" superfluous. Wiatt points out, however, that the contractual definition — even if it had no effect on equitable distribution — would still play a vital role in protecting premarital assets from spousal inheritance claims. Both the recital and the body of the agreement support this interpretative inference. Under Wiatt's interpretation, the "now owned or hereinafter acquired" phrase protects not only premarital assets (as the recital contemplates), but also property acquired during marriage that the equitable distribution statute would accept as separate (as paragraph 2(B) contemplates). See generally Code § 20-107.3(A)(1)(ii), (A)(1)(iii), (A)(1)(iv) & (A)(3).

We find equally unpersuasive, however, Wiatt's assertion that the plain meaning of the "Separate Property" definition necessarily excludes Vilseck's interpretation. As Vilseck points out, the structure of the agreement juxtaposes contractual "Separate Property" and its opposite: contractual "Joint Property" defined in paragraph 5 as property jointly titled. In the context of this agreement, Vilseck argues, it would not be unreasonable to insert the title qualifier of the joint property definition into its contractual antonym.

Add to this the ambiguity caused by paragraph 7(C), which contemplates a "monetary award" after five years of marriage. Vilseck notes that the proviso says any such award must be

"subject" to the "definition of 'Separate Property' contained herein.'" If that contractual definition serves only to shield property from spousal inheritance rights, he contends, one would not expect the proviso to appear in a paragraph addressing only equitable distribution rights. On the other hand, Wiatt argues, if separate property includes property acquired by one spouse during marriage, and joint property includes property acquired jointly during marriage (subject only to a later partition of the undivided half interests), there would be nothing much left to distribute under the equitable distribution statute — thereby making the whole paragraph largely irrelevant.

In short, both Vilseck and Wiatt can carry on such point-counterpoint debates in far more detail and for far longer than present purposes require. We offer no opinion on which of the two competing interpretations is the better one. We hold only that both appear reasonable on their face, and thus, neither can credibly claim the invincibility of the plain meaning rule. Because an ambiguity exists within the four corners of the agreement, the parties should have been given an opportunity to present extrinsic evidence in support of their respective interpretations. The chancellor erred in concluding otherwise.

On remand, the chancellor should "consider parol evidence to ascertain the intent of the parties." Video Zone, Inc., 267 Va. at 626, 594 S.E.2d at 924. This evidence "is admissible, not to contradict or vary contract terms, but to establish the real contract between the parties." Id. (citation omitted). In doing so, the chancellor should give "great weight" to the parties' own "interpretation and dealings with regard to contract terms" if otherwise compatible with the law. Id. at 627, 594 S.E.2d at 924. "Thus, uncertain rights of parties may be determined and fixed by their practical dealings with each other." Id.

III.

We hold the plain meaning of the premarital agreement does not necessarily exclude Vilseck's interpretation or embrace Wiatt's. Given this textual ambiguity, the chancellor should consider on remand whatever admissible extrinsic evidence exists on the proper construction of the agreement and reinterpret it in light of this additional evidence.

Reversed & remanded.