UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, AtLee and Chaney
Argued by videoconference


JOHN F. SPRUILL

MEMORANDUM OPINION* BY
v.        Record No. 0936-21-1        JUDGE RICHARD Y. ATLEE, JR.
                                              JULY 12, 2022
RAE WATTS SPRUILL


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Mary Jane Hall, Judge

Jennifer L. Fuschetti (Garriott Maurer, P.C., on brief), for
appellant.

J. Roger Griffin, Jr. (Christie, Kantor, Griffin & Smith, P.C., on
brief), for appellee.


Appellant John F. Spruill ("husband")[1] appeals the circuit court's order finding that he

had failed to comply with the terms of a marital property settlement agreement and ordering him

to pay Rae W. Spruill ("wife") $177,151.  He argues that the circuit court erred by concluding

that the term "shareholder distributions" was an ambiguous term.  Additionally, he contends that

if the term is ambiguous, the circuit court erred by considering only wife's intent to ascertain its

meaning.  For the following reasons, we affirm the decision of the circuit court.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] We recognize that "former husband" and "former wife" would be more accurate, but we
use less cumbersome titles in this memorandum opinion for ease of reference.

I. BACKGROUND

The parties married in Virginia in 1985, and they separated in 2018. On December 2, 2019, the parties entered into a property settlement agreement ("PSA"). Their divorce was finalized on January 21, 2020, and the divorce decree incorporated the PSA.

During the marriage, the parties were both shareholders in PMAT, Inc., a Virginia corporation. Wife owned 61% of the shares, and husband owned 24%. Wife was also the Director, President, and CEO. As part of the PSA, wife agreed to sell her shares in PMAT to husband for an agreed-upon sum, and she also agreed to be removed as Director effective January 1, 2020.[2] Paragraph 9 of the PSA also provided that "[w]ife shall receive her 2019 shareholder distributions and shall be permitted to review the Company's financial documentation for 2019."

On July 13, 2020, wife received the 2019 Schedule K-1 tax form from PMAT. The K-1 form reported that wife's share of the corporate income for 2019 was $287,895.[3] Wife did not receive a distribution check for the K-1 amount or any other amount. Instead, after she asked PMAT for her distribution, PMAT provided wife with an accounting, indicating it had charged $110,744 against wife for amounts owed to PMAT.[4] The PMAT board met and voted to issue

_____

[2] Wife stepped down from the roles of President and CEO in 2019.

[3] PMAT is an "S Corporation." 26 U.S.C. § 1361(a) (2018). This means that the corporation itself is not taxed by the federal government. Instead, the profits and losses pass through the corporation to the individual shareholders, pro rata. 26 U.S.C. § 1366 (2018). This means that the individual shareholders pay the taxes on his or her pro rata share of the corporation's income. 26 U.S.C. § 1366(a).

[4] PMAT paid wife $10,000 per month, which was initially intended as payment for wife's shares. When PMAT did not purchase the shares, it deemed the amount paid to wife an advance on wife's 2019 shareholder distribution. Additionally, PMAT had originally covered certain expenses that it later determined were wife's personal expenses rather than business expenses. These personal expenses were also credited against wife's distribution amount. The combined

formal shareholder distributions to "true up" what had already been paid or advanced to shareholders. Thus, for 2019, PMAT "distributed" to wife the $110,744 that had already been paid out.

On April 26, 2021, wife filed a petition to show cause, alleging that husband had failed to comply with the terms of the PSA. Specifically, she argued that PMAT was required to pay her $287,895, her share of PMAT's income as listed in the K-1, as her 2019 shareholder distribution. She contended that husband, as the controlling shareholder of PMAT, could not blame the company and its board for the lower distribution.

The circuit court issued an order to show cause, and, on July 13, 2012, husband appeared before the circuit court. He argued that the term "2019 shareholder distributions" in the PSA meant that wife was entitled to the shareholder distribution as decided on by PMAT's board, not to her full share of corporate income. He pointed out that distributions and corporate income, particularly in these types of business structures, are two distinct concepts.

During the hearing, the circuit court found that the terms of the PSA were ambiguous. Over husband's objection, the circuit court allowed the presentation of parol evidence of the parties' intent. Both husband and wife testified about the PSA.

The circuit court ultimately concluded that husband violated the terms of the PSA. It found that "2019 shareholder distributions" required husband to "effect a distribution of the K-1 earnings of the corporation." The circuit court came to that conclusion "because that was [wife's] most recent experience with respect to the amount of the distributions and because it simply defies logic that she would have bargained for a complete unknown, which is whatever

_____

total of payments and covered expenses was $110,744. Wife initially contested the $110,744. During trial, however, wife stated that she "could let it go," and she does not contest the amount on appeal.

- 3 -

PMAT decides to distribute that's all she gets." It expressly stated that it found that this interpretation was "everybody's agreement." The circuit court ordered husband to pay wife $177,151, the difference between the $287,895 K-1 income and the $110,744 she already received. The circuit court did not find husband in contempt because it concluded that the noncompliance was not willful. It also declined to award wife attorney's fees.

Husband now appeals to this Court.

II. ANALYSIS

*A. The "shareholder distributions" provision is ambiguous.*

Husband argues that the circuit court erred by finding the term "shareholder distributions" ambiguous and considering parol evidence to interpret its meaning. He contends that the term is unambiguous, and he argues it refers to the distributions decided on by PMAT.

"The question [of] whether contract language is ambiguous is one of law, not fact." *Plunkett v. Plunkett*, 271 Va. 162, 166-67 (2006). Thus, we are "not bound by the trial court's conclusions as to the construction of the disputed provisions," *Jones v. Gates*, 68 Va. App. 100, 105 (2017) (quoting *Smith v. Smith*, 3 Va. App. 510, 513 (1986)), and we review a court's interpretation of the parties' agreement *de novo*, *Allen v. Allen*, 66 Va. App. 586, 595 (2016).

"Property settlement agreements are contracts and are subject to the same rules of construction that apply to the interpretation of contracts generally." *Price v. Peek*, 72 Va. App. 640, 646 (2020) (quoting *Jones*, 68 Va. App. at 105). "When applying these rules, the court's function is to 'construe the contract made by the parties, not to make a contract for them.'" *Stacy v. Stacy*, 53 Va. App. 38, 44 (2008) (*en banc*) (quoting *Irwin v. Irwin*, 47 Va. App. 287, 293 (2005)). "In reviewing a property settlement agreement, the court must determine 'the intent of the parties and the meaning of the language . . . from an examination of the entire instrument,

- 4 -

giving full effect to the words the parties actually used.'" *Price*, 72 Va. App. at 646 (alteration in original) (quoting *Jones*, 68 Va. App. at 105).

"Where the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning," *Plunkett*, 271 Va. at 167 (quoting *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.C.C.*, 263 Va. 116, 119 (2002)), and "the Court will not look for meaning beyond the instrument itself," *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 632 (2002). When a contract is ambiguous, however, "the Court will look to parol evidence in order to determine the intent of the parties." *Id.*

"An agreement should be deemed 'ambiguous if it may be understood in more than one way or when it refers to two or more things at the same time.'" *Vilseck v. Vilseck*, 45 Va. App. 581, 588 (2005) (quoting *Video Zone, Inc. v. KF & F Props.*, 267 Va. 621, 625 (2004)). However, "[a] contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." *Allen*, 66 Va. App. at 596 (quoting *TM Delmarva Power*, 263 Va. at 119). Rather, "it must be objectively reasonable to understand the contractual language 'in more than one way' or to conclude that it 'refers to two or more things at once.'" *Vilseck*, 45 Va. App. at 588-89 (quoting *Pocahontas Mining L.L.C. v. Jewell Ridge Coal Corp.*, 263 Va. 169, 173 (2002)). "In order to determine whether the language is ambiguous, we look at the words at issue within the four corners of the Agreement itself." *Eure*, 263 Va. at 632.

We hold that the PSA is ambiguous on its face because the relevant provision of the PSA can be interpreted in more than one way. Paragraph 9 of the PSA provides, in relevant part, "Wife shall receive her 2019 shareholder distributions and shall be permitted to review the Company's financial documentation for 2019."

"The Supreme Court has held that when interpreting the plain meaning of a contract's terms, the court assigns reasonable meaning to the words and clauses in the contract . . . ." *Allen*, 66 Va. App. at 596; *see also Worsham v. Worsham*, 74 Va. App. 151, 168 (2022) ("The words of an instrument 'are normally given their usual, ordinary, and popular meaning.'" (quoting *Riverside Healthcare Ass'n v. Forbes*, 281 Va. 522, 530 (2011))). Given the placement of "shareholder distributions" within a paragraph relating to a corporation, it is objectively reasonable to interpret the provision as husband did in his brief: "a distribution of property (meaning money, securities, or any other property except stock in the corporation making the distribution) made by a corporation to a shareholder." Shareholder distributions are determined by the board of the corporation, and distributions are not necessarily, though they can be, equivalent to the K-1 income attributed to the shareholders. *See, e.g.*, Code § 13.1-653(A) ("The board of directors may authorize and the corporation may make distributions to its shareholders, subject to restriction by the articles of incorporation and the limitation in subsection C.").

Wife does not argue that "shareholder distribution" means something other than a distribution of property from a corporation to a shareholder. Instead, she argues that the agreement requires her "shareholder distribution" to be equal to her share of the K-1 income, consistent with past practices, rather than an arbitrary amount voted upon by the board. Wife's interpretation of "shareholder distribution" as relating to the K-1 income is objectively reasonable because "contracts must be considered as a whole 'without giving emphasis to isolated terms.'" *Allen*, 66 Va. App. at 596 (quoting *TM Delmarva Power*, 263 Va. at 119). And a court is "not to treat any word or clause in the PSA 'as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.'" *Stacy*, 53 Va. App. at 48 (quoting *Dominion Sav. Bank, FSB v. Costello*, 257 Va. 413, 417

(1999)). Contract provisions "are to be harmonized when possible." *Id.* (quoting *Virginian Ry. v. Hood*, 152 Va. 254, 258 (1929)).

The "shareholder distribution" provision grants wife the right "to review the Company's financial documentation for 2019." This bargained-for right to review PMAT's financial documentation strongly suggests an entitlement to a distribution in an amount not determined solely by the board's unfettered discretion. If the distribution was solely at the discretion of the board, then wife would have no need to review the financial documents. The remainder of the paragraph already set out both the amount husband was to pay for wife's shares and the payment schedule, meaning the right to review the financial documents must relate to the payment of wife's shareholder distributions. This implies that the "shareholder distributions" term is connected to the income of PMAT.

Furthermore, under husband's interpretation, PMAT's board could have decided not to make distributions. But the provision states that "[w]ife *shall receive* her 2019 shareholder distributions." (Emphasis added.) *See TM Delmarva Power*, 263 Va. at 121 (noting "the word 'shall' is primarily mandatory in effect, and 'may' is primarily permissive in effect"). Like the bargained-for right to review, the mandatory language used in connection with the shareholder distribution provision strongly suggests an entitlement to a distribution not wholly subject to the unfettered discretion of the PMAT board. *See City of Chesapeake v. States Self-Insurers Risk Retention Grp.*, 271 Va. 574, 578 (2006) ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." (quoting *D.C. McClain, Inc. v. Arlington Cnty.*, 249 Va. 131, 135-36 (1995))). Furthermore, the context of this agreement is a contract between husband and wife for the final disposition of her shares in PMAT. Given this context, and reviewing the

provision as a whole, rather than focusing on an isolated term, wife's interpretation of "shareholder distributions" is objectively reasonable.

Because both husband's and wife's interpretations of the phrase "shareholder distributions" are objectively reasonable, the language in the PSA is ambiguous. Accordingly, the circuit court did not err in so holding.

B. *The circuit court properly considered the intent of both parties*.

Husband next argues that the circuit court erred "by considering the intent of only one of the parties in order to ascertain [the PSA's] meaning." Specifically, he argues that the circuit court erred by considering only wife's subjective intent. We disagree.

Although the circuit court did adopt wife's understanding of the agreement, it also held that it was persuaded that it was "*everybody's* agreement that she would get whatever her share of the K-1 income was." (Emphasis added.) The record supports that conclusion. When interpreting a contract, "[t]he facts and circumstances surrounding the parties when they made the contract, and the purposes for which it was made, may be taken into consideration as an aid to the interpretation of the words used.'" *Stroud v. Stroud*, 49 Va. App. 359, 367 (2007) (alteration in original) (quoting *Seaboard Air Line R.R. v. Richmond-Petersburg Tpk. Auth.*, 202 Va. 1029, 1033 (1961)).

The circuit court here pointed to the fact that wife's interpretation was consistent with the recent business practices of PMAT. The financial documents show that the shareholders received as their 2017 and 2018 shareholder distributions an amount equal to, or more than, the K-1 income. Moreover, paragraph 9 of the PSA was intended to compensate wife for her interest in PMAT, and considering those circumstances, the circuit court noted that "it defies logic that [wife] would have bargained for a complete unknown" dependent on the discretion of the PMAT

board. If husband's interpretation was correct, PMAT could have decided not to issue distributions at all, and wife would have been stuck with that outcome, which is inconsistent with the purposes of the contract.

Although husband argues his testimony demonstrates that he never confused "shareholder distributions" with "K-1 income," he also testified that he expected that the 2019 distribution would be done the same way the company had always made shareholder distributions.[5] The three years of financial documents presented to the circuit court were more consistent with wife's argument that shareholder distributions were equal to the K-1 income. Simply because the circuit court found in favor of wife does not mean that it did not consider husband's evidence. It was not "plainly wrong" for the circuit court to conclude that the parties intended wife's 2019 shareholder distribution to be equivalent to the K-1 income amount because the evidence supported that finding. *See Ott v. L & J Holdings, LLC*, 275 Va. 182, 187 (2008) (noting that trial court's ruling on the parties' intent is a finding of fact that we will not reverse "unless it is apparent from the evidence that it is plainly wrong or without evidence to support it"). Accordingly, we find that the circuit court did not err.

## C. *Attorney Fees*

Wife contends that she is entitled to attorney fees under the terms of the PSA because she successfully enforced the terms of the agreement.[6] We agree.

---

[5] In weighing and evaluating husband's testimony, the circuit court may have considered (and weighed accordingly) that husband, despite his certainty that "shareholder distributions" was not intended to be equivalent to "K-1 income," was unable to explain why the financial documents show wife's 2019 distribution was $157,150, but she only received the benefit of $110,744. Nor could he explain why wife's 2019 distribution ($110,744) was only 39% of her K-1 income and the other shareholders received 54% of their K-1 income.

[6] It is unclear whether wife's request for attorney fees is a request related to the entire trial or for those fees related to the proceedings on appeal. The circuit court denied wife's

"[I]f a property settlement agreement contains a provision awarding attorney's fees, the court must follow the terms of that agreement, to the extent allowable by law." *Jones*, 68 Va. App. at 106; Code § 20-109(C). Paragraph 28 of the PSA provides, in part,

> [i]f either the Husband or the Wife fails to comply with the terms and conditions of this Stipulation and Agreement, the injured party may take whatever legal action is deemed appropriate to enforce his or her rights in accordance with the terms set forth herein. If a judicial determination is made wherein one of the parties is deemed to have breached this Agreement, said party shall be responsible for all costs incurred by the other seeking such a finding which shall include, but not limited to, counsel fees, court costs, investigation fees and travel expenses, incurred by a party in the successful enforcement of any of the agreements, covenants or provisions of this Agreement or of the validity of the Agreement itself, whether through litigation or other action necessary to compel compliance herewith.

"Enforcement is defined as "[t]he act or process of compelling compliance with a . . . decree or agreement." *Jones*, 68 Va. App. at 107 (alterations in original) (quoting *Enforcement*, *Black's Law Dictionary* (9th ed. 2009)). "An action to enforce a contractual obligation often originates with a rule to show cause." *Id.*

Wife filed a petition to show cause to enforce the terms of the PSA. The circuit court concluded that wife's interpretation of the PSA was correct and that husband breached the terms of the PSA by not paying wife the amount owed to her. We now affirm that decision on appeal. In accordance with the PSA, husband, as the breaching party, is required to pay wife's attorney fees related to this appeal.

request for attorney fees in the circuit court, and wife did not object to the ruling. Nor did she note a cross-appeal related to that issue. Consequently, the issue of whether wife is entitled to attorney fees for proceedings in the circuit court is not properly before us. Rule 5A:18; 5A:21(b).

III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed. We remand the case to the circuit court solely for the purpose of determining appropriate attorney fees associated with this appeal.

*Affirmed and remanded.*